## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| United States of America *ex rel.* | : | Civil Action No. 1:15cv555 |
| Brandee White, Laura L. Cunningham, | : | |
| and Jeffrey M. Wisler | : | |
| | : | United States District Court |
| *Plaintiffs*, | : | Judge Susan J. Dlott |
| | : | |
| v. | : | Magistrate Judge Karen L. Litkovitz |
| | : | |
| Mobile Care EMS & Transport, Inc. | : | |
| | : | **Second Amended Complaint** |
| *and* | : | |
| | : | |
| LogistiCare Solutions, LLC | : | |
| | : | |
| *Defendants.* | : | |
| _____ | : | |

## I.     INTRODUCTION

1.     Relators Brandee White, Laura L. Cunningham, and Jeffrey M. Wisler bring this *qui tam* False Claims Act on behalf of the United States against ambulance transportation supplier Mobile Care EMS & Transport, Inc. ("Mobile Care") and non-emergency medical transportation broker LogistiCare Solutions, LLC ("LogistiCare") to recover damages and civil penalties for violations of the False Claims Act, 31 U.S.C. § 3729−3733.  These violations arise out of the submission of false or fraudulent claims to the United States through the federally-funded Medicare Part B, Medicaid, Medicare Advantage, and MyCare Ohio healthcare programs (collectively referred to as "Government healthcare programs") for ambulance transport services supplied by and/or arranged for by these Defendants.

2.     Government healthcare programs cover and pay for ambulance transport of beneficiaries only when such transport is medically necessary.  Government

healthcare programs also pay for ambulance transports only if other prerequisite coverage requirements specified by the Government are met, such as obtaining the signature of the patient authorizing submission of the claim, obtaining a physician certification for all nonemergency transportation, and origin and destination requirements.

3.  Medical necessity and compliance with prerequisite billing requirements are material to the Government's decision to pay for ambulance transport because the Government will not pay for ambulance transport without demonstration that medical necessity existed and prerequisite requirements were met.

4.  At all relevant times the Defendants knew the Government would not pay claims for ambulance transport unless medical necessity and compliance with prerequisite billing requirements were met and the ambulance supplier's documentation demonstrates that these requirements were met.

5.  Nevertheless, Defendants routinely presented and caused the presentation of false claims for payment to the Government for ambulance transports that were not medically necessary, were billed at a level of ambulance service that was not medically necessary, for which Defendants failed ensure the patient's signature was obtained (or to take another specified measure), and/or for which Defendants failed ensure that a physician's certification authorized the transportation.  In making such routine false claims for payment, Defendants made or cause to be made false statements, such as certifications of compliance (both expressed and implied), that the ambulance transports actually were medically necessary and/or that all prerequisite requirements had been met.

2

6.     Defendant Mobile Care EMS & Transport, Inc.'s Director of Medical Transportation Services admitted in writing to Relator Brandee White that Mobile Care would not attempt to achieve total compliance with Government requirements for ambulance transport, but instead would only attempt to operate with 80% to 90% compliance with such Medicare requirements because he believed they would otherwise go out of business.

7.     Defendant LogistiCare Solutions, LLC has a practice of causing ambulance transport suppliers to submit false claims for ambulance transport that lack medical necessity.

8.     Prior to filing their Complaint and all amended Complaints, Relators provided the United States Attorney for the Southern District of Ohio with a Disclosure Statement of material evidence and information in their possession related to the allegations in the Complaint, the Amended Complaint, and this Second Amended Complaint in accord with 31 U.S.C. § 3729(b)(2).  The Disclosure Statement was supported by material evidence establishing the existence of Defendants' false claims. The Disclosure Statement, as well as all supplemental Disclosure Statements, include the work product of Relators' attorneys, and were all submitted to the Attorney General and to the United States Attorney as potential co-counsel in the litigation pursuant to joint prosecution and common interest privileges.  Therefore, these disclosures are confidential and privileged.

9.     Before filing this Second Amended Complaint, Relators consulted with counsel for the United States regarding the Government's position whether Relators' Second Amended Complaint should be filed under seal (which is needed when further

Government investigation is necessary based on amended allegations) or on the public record. Counsel for the United States approved the filing of the Second Amended Complaint on the public record.

10. The Government has intervened as to Mobile Care EMS & Transport, Inc., and so the Government's operative Complaint in Intervention is now the operative Complaint regarding Mobile Care EMS & Transport, Inc.'s violations of 31 U.S.C. §§ 3729(a)(1)(A) and (a)(1)(B). Relators hereby adopt the allegations made in the Government's operative Complaint as to Mobile Care EMS & Transport, Inc's violations of 31 U.S.C. §§ 3729(a)(1)(A) and (a)(1)(B) by reference, but retain their allegations for additional relief under these causes of action against Mobile Care EMS & Transport, Inc. (such as a statutory Relators' share, attorneys fees, expenses, and costs), as well as Relator White's personal claims against Mobile Care EMS & Transport, Inc., alleged in Counts Three to Five.

11. There has been no "public disclosure," as that term is defined in the False Claims Act, 31 U.S.C. § 3730(e)(4)(A), of the false claims or allegations herein.

12. Even if a public disclosure has occurred, each Relator is an original source pursuant to 31 U.S.C. § 3730(e)(4)(B). Relators voluntarily disclosed to the Government the information on which the allegations or transactions involved in this litigation are based prior to any public disclosure. Additionally, Relators have knowledge that is independent of any such public disclosure and materially adds to the publicly disclosed allegations or transactions, which Relators voluntarily provided to the United States before filing this action.

## II.     JURISDICTION AND VENUE

13.     This action arises under the False Claims Act, as amended, 31 U.S.C. §§ 3729-3733.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1345 and 1331.

14.     This Court has personal jurisdiction over all defendants because all of the defendants can be found, reside, transact business, or committed acts proscribed by the False Claims Act within the State of Ohio and the United States.

15.     Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) because at least one defendant transacts business within this district and has committed acts proscribed by the False Claims Act within this district.  Defendant LogistiCare Solutions, LLC transacts business in this judicial district by brokering ambulance transportation in Southwestern Ohio in this District.  On information and belief, Defendant LogistiCare Solutions, LLC has committed acts in violation of the False Claims Act in Southwestern Ohio in this District.  Defendant Mobile Care EMS & Transport, Inc. transacts business by submitting claims for payment to the Ohio Medicaid program (headquartered in Columbus, Ohio) and to Aetna's MyCare Ohio plan (located in New Albany, Ohio).  In addition, Defendant Mobile Care EMS & Transport, Inc. occasionally transacts business within this district by transporting patients within this District to Columbus, Springfield, and Dayton.

## III.     PARTIES

16.     Relators Brandee White, Laura L. Cunningham, and Jeffrey M. Wisler are all current or former employees of Defendant Mobile Care EMS & Transport, Inc. and bring this suit for themselves and on behalf of the United States, the real party in

5

interest, pursuant to the authority granted to them by 31 U.S.C. § 3730(b).

17. **Relator Brandee White** is a former Emergency Medical Technician ("EMT") and EMT manager. She was hired by Defendant Mobile Care EMS & Transport, Inc. in February 2014 as the EMS Billings/Collections Coordinator. In this role, Relator White was a manager responsible for compliance, reducing uncollected payments, increasing profits, and other supervisory functions. Relator White reported directly to Joseph H. ("Joe") Wallace, who is the principal shareholder, President, CEO, and/or manager of Defendant Mobile Care EMS & Transport, Inc.

18. Relator White's compliance and training efforts throughout 2014 and 2015 were designed to improve Mobile Care EMS & Transport Inc.'s compliance with legal requirements for proper billing. However, the improvements in compliance due to Relator White's efforts also reduced the number of ambulance trips made by Mobile Care and, as a result, reduced Mobile Care's profits.

19. On June 1, 2015, Relator White was demoted to the reduced role of Collections Coordinator. As Collections Coordinator Relator White officially still reported to Joe Wallace, but as a result of her demotion Relator White actually reported to Eric McAllister. Mr. McAllister is the Director of Medical Transportation Services for Defendant Mobile Care EMS & Transport Inc. and is responsible for Mobile Care Group EMS & Transport Inc.'s profit and loss statements. In an effort to conceal the truth of Relator White's demotion, Joe Wallace told Relator White on approximately June 1, 2015, that Eric McAllister was and had always been her supervisor. Relator White had never before been so informed, and had always, prior to June 1, 2015, reported directly to Joe Wallace without ever considering Eric McAllister her supervisor.

20.     Following her demotion, Relator White continued to make efforts to improve Mobile Care EMS & Transport Inc.'s compliance with legal requirements for proper billing, but on August 17, 2015 she was terminated by Joe Wallace.

21.     **Relator Laura L. Cunningham** has more than 10 years experience in coding and billing for ambulette and ambulance transport and has completed course work in coding.  Relator Cunningham was hired by Defendant Mobile Care EMS & Transport Inc. in March 2014 as an ambulance biller.  Relator Cunningham's refusal to bill for services that were not supported by Defendant Mobile Care EMS & Transport records has resulted in her managers circumventing her and having another coder improperly bill for these services.  Relator Cunningham is presently still an employee of Defendant Mobile Care EMS & Transport.

22.     **Relator Jeffrey M. Wisler** has worked as a licensed EMT in Ohio and in Florida for seven years.  He is a nationally certified paramedic though the National Registry of Medical Technicians.  He has completed the American Heart Association's training in Advanced Cardiovascular Life Support, Pediatric Advanced Life Support, and CPR, and has been certified by the Internal Trauma Life Support.  Prior to his work as an EMT, Relator Wisler worked as a hospital-based Emergency Department technician. Relator Wisler was hired by Defendant Mobile Care EMS & Transport, Inc. in April 2013 and worked as an EMT.  While on a medical leave of absence, on December 16, 2015, Relator Wisler was informed by Defendant Mobile Care EMS & Transport, Inc.'s employee benefits company that he would need to obtain COBRA or other insurance because his employment had ended.  Relator Wisler raised this matter the next day with Eric McAllister, who acknowledged that Relator Wisler had been terminated.

23.    **Defendant Mobile Care EMS & Transport, Inc.** (d/b/a "Mobile Care Group") is an Ohio corporation that does business in the State of Ohio. Its principal office is at 5151 S. Main St., Sylvania, Ohio 43560. Defendant Mobile Care EMS & Transport, Inc. ("Mobile Care") is a participant in the Government healthcare programs. At all times relevant to this Second Amended Complaint, Defendant Mobile Care, either directly or through its subsidiaries and agents, provided emergency and nonemergency transportation for beneficiaries of Government healthcare programs in Ohio.

24.    **Defendant LogistiCare Solutions, LLC** is a Delaware Corporation that does business throughout the State of Ohio. Its principal office is at 1275 Peachtree St NE #600, Atlanta, GA 30309. LogistiCare Solutions, LLC ("LogistiCare") contracts with Medicare Advantage and state Medicaid plans throughout the country to manage their non-emergency transportation. LogistiCare claims to be the largest and most experienced broker of such transportation services in the country.

25.    A map available on LogistiCare's website shows that in 48 states including Ohio, LogistiCare has contracted managed care organizations that manage Medicare Advantage, Medicaid, and/or commercial nonemergency ambulance transportation. https://www.logisticare.com/reservation-numbers-location-map (accessed May 10, 2019).

## IV.    GOVERNMENT-FUNDED HEALTHCARE

### A.    Medicare

26.    The Medicare Program was established by the Federal Government in 1965 to provide health insurance for the elderly and the disabled. *See generally* 42 U.S.C. §§ 1395, *et seq.*

8

27.     The Department of Health and Human Services ("HHS") administers the Medicare Program through the Centers for Medicare & Medicaid Services ("CMS").

28.     As originally established in 1965, the Medicare Program consisted of two parts, Part A and Part B.  Part A authorizes the payment of federal funds for inpatient care including care rendered in a hospital.  *See generally* 42 U.S.C.§§ 1395c–1395i-2. Part B authorizes the payment of federal funds for outpatient medical and other health services.  *See e.g.*, 42 U.S.C.§ 1395k.

29.     As it relates to the Medicare Program, Relator's allegations in this Second Amended Complaint primarily involve the Defendants' false and fraudulent claims made under Medicare Part B for ambulance transports that were not medically necessary and/or when prerequisite billing requirements were not met.

### 1.     Medicare Part B

30.     Medicare Part B authorizes the payment of federal funds for certain medical and other health services (*see* 42 U.S.C. § 1395k(a)(2)(B)), including charges for ambulance services.  *See* 42 C.F.R. § 410.10(I).

31.     Part B providers and suppliers are required to comply with Medicare's Manuals, as well as with all Medicare statutes and regulations, when submitting claims seeking reimbursement for ambulance services provided to Part B beneficiaries.

32.     Reimbursement for Medicare claims is made through CMS.  CMS contracts with private contractors in each region of the United States to pay Part B claims from the Medicare Trust Fund under 42 U.S.C. § 1395u.  These private contractors are currently referred to as medicare administrative contractors.  *Id*.

33.     CMS currently administers the Medicare Part B Program in the State of

9

Ohio through CGS Administrators, LLC ("CGS").

34.     As the Medicare administrative contractor for the Medicare Part B insurance program in Ohio, CGS receives requests for payment from Part B suppliers and providers for medical services furnished to Medicare beneficiaries, determines the payment amounts due, and makes the payments to the providers or suppliers.  *See* 42 U.S.C. § 1395kk-1(a)(4).

35.     To bill the Medicare program for services provided to Medicare beneficiaries, ambulance suppliers (like Mobile Care and other ambulance suppliers for whom LogistiCare brokers ambulance transports) must meet and maintain certain enrollment requirements.  42 C.F.R. § 424.500.

36.     One of these enrollment requirements is that the ambulance suppliers Care must truthfully complete and submit an enrollment application, which is Medicare's standard Supplier Agreement.  42 C.F.R. §§ 424.510(a), (d)(2)(i).

37.     The Supplier Agreement must be signed "by an individual who has the authority to bind the provider or supplier legally and financially."  "The signature attests that the information submitted is accurate and that the provider or supplier is aware of, and abides by, all applicable statutes, regulations, and program instructions."  42 C.F.R. § 424.510(d)(3).  The Supplier Agreement requires its signatories to certify as follows:

> I agree to abide by the Medicare laws, regulations, and
> program instructions that apply to this supplier.  The
> Medicare laws, regulations, and program instructions are
> available through the Medicare contractor.  I understand that
> payment of a claim by Medicare is conditioned upon the
> claim and the underlying transaction complying with such
> laws, regulations, and program instructions. . . . and on the
> supplier's compliance with all applicable conditions of
> participation in Medicare.

*See* Medicare Enrollment Application, Form CMS-855B.

38.     Furthermore, to enroll and maintain active enrollment status in the Medicare program, ambulance suppliers must comply with applicable Medicare regulations.  42 C.F.R. § 424.516(a)(1).

39.     Thus, Mobile Care, and the other ambulance suppliers for whom LogistiCare brokers ambulance transports, have all agreed to abide by and follow all Medicare laws, regulations, and program instructions applicable to it as a supplier of ambulance services, and such agreement was a material condition of payment of its claims to the Medicare program.

40.     To obtain payment for services covered by Medicare, ambulance suppliers are required to submit claim forms which they must sign.  42 C.F.R. § 424.30; 42 C.F.R. § 424.33.

41.     Independent ambulance suppliers bill for ambulance services rendered to Medicare beneficiaries using the Claim Form CMS-1500 (or its electronic equivalent, the ASC X12 837 professional claim transaction).[1]  *See* Centers for Medicare and Medicaid Services, Medicare Claims Processing Manual, CMS Pub. 100-04, Chap. 15-Ambulance, Sec. 30 (Rev. 3076, Sept. 24, 2014).

42.      Ambulance suppliers submit a claims for payment for transport off

---

[1] Available at https://www.cms.gov/Regulations-and-Guidance/Guidance/ Manuals/Internet-Only-Manuals-IOMs-Items/CMS018912.html?DLPage=1&DLEntries =10&DLSort=0&DLSortDir=ascending.  This chapter of the Medicare Claims Processing Manual defines independent ambulance providers as "suppliers."  *See* Sec. 10.3 (Rev. 3076, Sept. 24, 2014).  Since various Government Healthcare Programs use either the term "provider" or "supplier" to refer to entities that provide ambulance transportation services, both terms are interchangeably throughout this Second Amended Complaint.

Government healthcare program beneficiaries to the applicable Government healthcare program, on Claim Form CMS-1500 (or its electronic equivalent).

43.     As a condition of receiving payment of Government funds for ambulance transport, the ambulance suppliers must furnish certain information on the Claim Form CMS-1500 itself (or its electronic equivalent), including the identity of the patient, the supplier/provider number, the procedure code number, and a brief narrative explaining the diagnosis.

44.     Claim Form CMS-1500 expressly states that the signature of the submitting person or entity is a certification that all of the information on the Claim Form CMS-1500 is true, accurate and complete.

45.     Claim Form CMS-1500 expressly states that the signature of the submitting person or entity is a certification by the person or entity submitting the claim that the claim complies with all applicable Medicare laws, regulations, and program instructions for payment.

46.     Claim Form CMS-1500 expressly states that the signature of the submitting person or entity is a certification by the person or entity submitting the claim that the services on the form were medically necessary.

47.     By submitting Claim Form CMS-1500 for payment for ambulance transport, the ambulance suppliers made an express certification of compliance as to the accuracy of the information on the form, an express certification that all applicable Medicare and Medicaid laws and regulations had been followed, and an express certification that ambulance transport was medical necessity.

48.     The express certifications of compliance on Claim Forms CMS-1500

12

submitted by the ambulance suppliers for payment for ambulance transport influenced the Government's decision to pay the ambulance suppliers for such services.

### 2. Medicare Advantage

49.     Medicare Advantage (also referred to as Medicare Part C) is another part of the Medicare Program and is funded with Government money.  Medicare Advantage plans are Medicare health plans offered by private insurance companies that contract with Medicare to provide beneficiaries with their Part A and Part B benefits.

50.     Medicare Advantage plans provide coverage for ambulance services.  *See* Medicare Benefit Policy Manual, CMS Pub. 100-02, Chap. 10-Ambulance Services, Sec. 20.1.1 (Rev. 1696, March 6, 2009).

51.     Reimbursement conditions like those applicable to claims for ambulance services submitted under Medicare Part B similarly apply to claims for ambulance services submitted under Medicare Advantage plans.

52.     Ambulance suppliers submit claims for payment for Medicare beneficiaries with Medicare Advantage to the Medicare Advantage plan.  The plan then pays the claim with Government money.

### B. Medicaid

53.     The Medicaid program was established in 1965 pursuant to 42 U.S.C. §§ 1396, *et seq*.  Medicaid is a joint federal and state program that provides healthcare benefits for certain groups, primarily the poor and disabled.  Medicaid is jointly financed by the Federal Government and by the various state governments.

54.     Pursuant to the Medicaid program, the Federal Government provides funds to the states to provide medical assistance to individuals, including children and

13

aged, blind, or disabled individuals, whose income and resources are insufficient to meet the costs of necessary medical services. 42 U.S.C. § 1396-1. Funds for Medicaid are appropriated from the Treasury and are provided to the States. 42 U.S.C. §§ 1396-1, 1396b.

55.     Though funded primarily by the Federal Government, Medicaid programs are administered by the individual states. *See* 42 U.S.C. § 1396a.

56.     Each state establishes its own Medicaid program and determines the amount, duration, and scope of services covered within federal guidelines. States must cover certain mandatory benefits and may choose to provide other optional benefits.

57.     The Ohio Medicaid program was administered by the Ohio Department of Job & Family Services ("ODJFS") until July of 2013. Effective in July of 2013, the Ohio Department of Medicaid began administering Ohio's Medicaid program.

58.     The headquarters of the Ohio Department of Medicaid is located at 50 W Town St #400, Columbus, OH 43215.

59.     Every provider, including providers of ambulance transportation, who seeks payment from the federally-funded Ohio Medicaid Program is required to sign a Provider Agreement. *See* Ohio Administrative Code 5160-1-17(A)(4).

60.     As part of that standard Provider Agreement, all providers agree, *inter alia,* to comply with federal statutes and rules and with the Ohio Administrative Code. The provider also explicitly certifies by signing the Provider Agreement that the provider will "render medical services as medically necessary for the patient and only in the amount required by the patient. . . ." Ohio Administrative Code 5160-1-17.2(A).

61.     In addition, all providers of ambulance services must be certified under

14

and participating in Medicare pursuant to Ohio Medicaid requirements.  Ohio
Administrative Code 5160-15-02(B)(1).  Accordingly, in addition to signing the Ohio
Medicaid Provider Agreement, all providers of ambulance services under Ohio Medicaid
had to execute the standard Medicare Supplier Agreement in which they agree to abide
by all Medicare laws, regulations, and program instructions, and expressly acknowledge
that the payment of claims by Medicare is conditioned upon the claim and the
underlying transaction complying with those laws, regulations, and program
instructions and the provider's compliance with all applicable conditions of participation
in Medicare.  *See* Form CMS-855B.

62.     Ohio's Medicaid program covers the ambulance services provided by
Defendants.  *See* Ohio Administrative Code 5160-15-03(A).

63.     In submitting claims for payment, Medicaid providers acknowledge that
payment of their claims will be from federal and state funds.  *See* 42 C.F.R. § 455.18.

64.     The representations made by ambulance providers and suppliers in
agreements and in claim forms influence the State of Ohio's decision to pay Medicaid
funds for the claims submitted.

### C.     MyCare Ohio

65.     In addition to traditional Medicaid, the Ohio Department of Medicaid also
administers the MyCare Ohio program.

66.     The MyCare Ohio program is an Integrated Care Delivery System Plan in
Ohio that coordinates the healthcare benefits provided to those "dual eligible"
beneficiaries who are eligible to receive Medicare Parts A, B, and D and full Medicaid
benefits, and who live in one of the demonstration regions.  As such, the MyCare Ohio

15

program and payments for program beneficiaries are jointly funded with federal funds and state funds.

67.     The demonstration regions include the following Ohio counties: Fulton, Delaware, Butler, Lucas, Franklin, Clermont, Ottawa, Madison, Clinton, Wood, Pickaway, Hamilton, Union, and Warren.

68.     The Ohio Department of Medicaid has entered into agreements with private-entity managed care plans to manage the MyCare Ohio Program.

69.     MyCare Ohio requires that providers follow all Medicare and Medicaid guidelines for reimbursement, including those applicable to claims for ambulance services.

70.     Ambulance suppliers submit claims for payment for ambulance transport of Medicare beneficiaries enrolled in MyCare Ohio plans for which LogistiCare brokers transport by sending their claims to LogistiCare. LogistiCare then pays the claim with Government money supplied to it by the MyCare Ohio plan.

## V.     MEDICARE CONDITIONS OF PAYMENT FOR AMBULANCE TRANSPORT

71.     Beginning in approximately December 2009, Mobile Care became a participant in the Government healthcare programs, and began submitting claims seeking reimbursement for ambulance services provided to patients from these programs.

72.     Medicare Part B (and thus also Medicare Advantage) will pay for ambulance services provided to its beneficiaries only if:

a.     Actual transportation of the beneficiary occurs;

16

b. The beneficiary is transported to an appropriate destination;

c. The transportation by ambulance is medically necessary, *i.e.*, the beneficiary's medical condition is such that other forms of transportation are medically contraindicated;

d. All applicable vehicle, staffing, billing, and reporting requirements are met; and

e. The transportation is not part of a Part A service.

42 C.F.R. § 410.40(a); Medicare Claims Processing Manual, CMS Pub. 100-04, Chap. 15-Ambulance, Sec. 10.2 (Rev. 1696, Mar. 6, 2009).

### A. Medical Necessity Is Required to Bill Medicare for Ambulance Transportation and for the Level of Service Provided

73. Medicare only pays for those services furnished to beneficiaries which are "reasonable and necessary for the diagnosis or treatment of illness or injury . . . ." 42 U.S.C. § 1395y(a)(1)(A).

74. Likewise, a condition of payment of Medicare is that services provided are or were medically required.  42 U.S.C. 1395n(a)(2)(B).

75. Ambulance transport is only covered "where the use of other methods of transportation is contraindicated by the individual's condition, but, . . . only to the extent provided in regulations."  42 U.S.C. § 1395x(s)(7).

76. For ambulance transport to be considered medically necessary, the Medicare "beneficiary's condition must require both the ambulance transportation itself **and** the level of service provided . . . ." 42 C.F.R. § 410.40(d)(1) (*emphasis added*).

### 1. Medical Necessity for Ambulance Transportation

77. The Medicare Benefit Policy Manual further specifies that the medical necessity required to bill Medicare for ambulance transport is established as follows:

> Medical necessity is established when the patient's condition is such that use of any other method of transportation is contraindicated. In any case in which some means of transportation other than an ambulance could be used without endangering the individual's health, whether or not such transportation is actually available, no payment may be made for ambulance services.

Medicare Benefit Policy Manual, CMS Pub. 100-02, Chap. 10-Ambulance Services, Sec. 10.2.1 (Rev. 1, Oct. 1, 2003).

78.     The medical necessity requirement has long been treated by the Government as a material condition of coverage and payment of claims for ambulance transport service. The Government requires that claims be denied and not paid when there is no medical necessity for the ambulance transport. *E.g.* Department of Health and Human Services, Office of Inspector General, Ambulance Services for Medicare End-Stage Renal Disease Beneficiaries: Medical Necessity, 1 (Aug. 1994); Department of Health and Human Services, Office of Inspector General, Medicare Payments for Ambulance Transports, 1-2, 10-11 (Jan. 2006); Department of Health and Human Services, Office of Inspector General, Inappropriate Payments and Questionable Billing for Medicare Part B Ambulance Transports, 1 (Sept. 2015).

79.     Ambulance suppliers must always keep appropriate documentation on file to demonstrate medical necessity, and "[t]he presence of a signed physician certification statement does not alone demonstrate that the ambulance transport was medically necessary." Rather, "[a]ll other program criteria must be met in order for payment to be made." 42 C.F.R. §§ 410.40(d)(2)(ii), 410.40(d)(3)(v); *accord* Medicare Benefit Policy Manual, CMS Pub. 100-02, Chap. 10-Ambulance Services, Secs. 10.2.1 (Rev. 1, Oct. 1, 2003) & 10.2.4.

18

80.     In addition, to meet the medical necessity requirement, "the reason for the ambulance transport must be medically necessary.  That is, the transport must be to obtain a Medicare covered service, or to return from such a service."  Medicare Benefit Policy Manual, CMS Pub. 100-02, Chap. 10-Ambulance Services, Sec. 10.2.1 (Rev. 1, Oct. 1, 2003).

### 2.     Medical Necessity for Nonemergency Transportation

81.     Nonemergency ambulance transport is considered medically necessary **only if either**: "the beneficiary is bed-confined, and it is documented that the beneficiary's condition is such that other methods of transportation are contraindicated; **or**, if his or her medical condition, regardless of bed confinement, is such that transportation by ambulance is medically required."  42 C.F.R. § 410.40(d)(1) (*emphasis added*).

82.     A Medicare beneficiary is "bed confined" if the beneficiary "is unable to get up from bed without assistance," "is unable to ambulate," and "**is unable to sit in a chair or wheelchair**."  42 C.F.R. § 410.40(d)(1)(i)-(iii) (*emphasis added*).  As explained in the Medicare Benefit Policy Manual: "The term 'bed confined' is not synonymous with 'bed rest' or 'non-ambulatory'.  Bed-confinement, by itself, is neither sufficient nor is it necessary to determine the coverage for Medicare ambulance benefits."  Medicare Benefit Policy Manual, CMS Pub. 100-02, Chap. 10-Ambulance Services, Sec. 10.2.3 (Rev. 1, Oct. 1, 2003).

83.     Medicare's requirement that ambulance transportation be medically necessary is a material condition of payment of a claim for ambulance transport known to ambulance suppliers and to LogistiCare.  Medicare will not pay for or will deny a

claim for which the nonemergency transportation was not medically necessary. Department of Health and Human Services, Office of Inspector General, Medicare Payments for Ambulance Transports, 1-2, 6 (Jan. 2006).

**B. Physician Certification Billing Requirement For Nonemergency Ambulance Transportation.**

84.     In addition to obligations of ambulance suppliers to ascertain that beneficiaries meet Medicare's medical necessity and other requirements described above, Medicare only covers repetitive nonemergency ambulance transportation "if the ambulance provider or supplier, before furnishing the service to the beneficiary, obtains a written order from the beneficiary's attending physician [dated no earlier than 60 days before the date the service is furnished] certifying that the medical necessity requirements of paragraph (d)(1) of [42 C.F.R. § 410.40] are met."  42 C.F.R. § 410.40(d)(2)(i) (emphasis added).

85.     Medicare only covers unscheduled ambulance services or services scheduled on a non-repetitive basis when the ambulance supplier obtains a written order from the beneficiary's attending physician (or certain other enumerated providers) within 48 hours after the transport, certifying that the medical necessity requirements are met.  However, if the ambulance provider is unable to obtain the required certification within 21 calendar days following the date of the service, the provider may still submit the claim if it has documented its attempt to obtain the certification. 42 C.F.R. § 410.40(d)(3).

86.     A Physician Certification Statement is required before Medicare will pay a claim for nonemergency ambulance transportation.  77 Federal Register 44722, 44800

(July 30, 2012).

### C.    Patient Signature Requirement

87.    Unless the patient has died, another Medicare Condition of Payment is that the patient must either sign the claim to Medicare or must sign a form authorizing submission of the claim for payment to Medicare for the provided services.  42 C.F.R. § 424.36(a).

88.    If the patient is physically or mentally incapable of signing, one of the following may sign to authorize the claim: the patient's legal guardian; someone who receives Government benefits on the patient's behalf; a relative who arranges the patient's medical treatment or who otherwise has responsibility for the patient's affairs; or a representative of an agency or institution that did not furnish the services for which payment is claimed but furnished other care, services, or assistance to the beneficiary. 42 C.F.R. § 424.36(a) and (b).

89.    If reasonable efforts to locate and obtain the signature of one the persons listed in the preceding paragraph were unsuccessful, a representative of the ambulance provider claiming payment for services it has furnished may sign the claim.  42 C.F.R. § 424.36(b)(5).

90.    In addition, when a patient is physically or mentally incapable of signing for an ambulance transport services, an ambulance provider or supplier may sign when the prerequisite regulatory conditions and documentation requirements are satisfied. 42 C.F.R. § 424.36(b)(6).

91.    Satisfaction of the patient signature requirement is a basic requirement for submission of a claim to the Medicare program. 42 C.F.R. § 424.32(a)(3).  The signature

21

authorizes payment of the medical benefits to the ambulance provider.  Medicare Claims Processing Manual, CMS Pub. 100-04, Chap. 26,  Completing and Processing Form CMS-1500 Data Set, Sec. 10.3 (Rev. 3083, October 2, 2014).  In fact, when beneficiaries or their representatives refuse to sign, then the ambulance provider cannot bill Medicare, but may bill the beneficiary instead.  *Id.*, Chap. 1, General Billing Requirements, 50.1.5 (Rev. 1, October 1, 2003).

> **D.** **Level of Medically Necessary Services**

92.    Payment under the fee schedule is "made according to the level of medically necessary services actually furnished.  That is, payment is based on the level of service furnished (provided they were medically necessary), not simply on the vehicle used."  Medicare Benefit Policy Manual, CMS Pub. 100-02, Chap. 10-Ambulance Services, Sec. 10.2.2 (Rev. 103, Feb. 20, 2009).

93.    Medicare covers different levels of ambulance service based on the response time and level of care provided.  These service levels include Basic Life Support (emergency and nonemergency) ("BLS"), Advanced Life Support Level 1 (emergency and nonemergency) ("ALS1"), and Advanced Life Support Level 2 ("ALS2").  Different service levels are reimbursed at different rates based on a national fee schedule.  42 C.F.R. §§ 414.601–617.

94.    The Medicare Benefit Policy Manual, a manual published by CMS which sets forth rules and regulations for Medicare reimbursement, gives ambulance suppliers detailed information about the billing requirements for these different ambulance service levels.   Medicare Benefit Policy Manual, CMS Pub. 100-02, Chap. 10-Ambulance Services, Sec. 30.1.1 (Rev. 130, July 29, 2010).

22

95. Section 10.2.2 of the Medicare Benefit Policy Manual informs ambulance suppliers that the Government only pays for the level of medically necessary services actually provided:

> Reasonableness of the Ambulance Trip . . . payment is made according to the level of medically necessary services actually furnished. That is, payment is based on the level of services furnished (provided they were medically necessary), not simply on the vehicle used. Even if a local government requires an ALS response for all calls, payment...is made only for the level of service furnished, and then only when the service is medically necessary.

96. In short, when another means of transportation could be used without endangering the individual's health—whether or not such other transportation is actually available to the individual—Medicare will not reimburse transport by ambulance.

97. Medicare Part B pays the lower of the actual charge or the fee schedule amount. 42 C.F.R. § 414.610(a). Generally, the fee schedule amount is computed by multiplying the Conversion Factor (dollar amount specified by Medicare) by the Relative Value Unit for the Service. 42 C.F.R. §§ 414.605, 414.610(c). The product of this amount is then adjusted by a Geographical Adjustment Factor and may be adjusted again if the service originated in an urban or rural area. *Id.* The provider also receives payment for loaded mileage charges (from pickup of patient to arrival at the patient's destination). *Id.*, Medicare Claims Processing Manual, CMS Pub. 100-04, Chap. 15-Ambulance, Sec. 20.2 (Rev. 1696, Mar. 6, 2009).

98. The Relative Value Units depends on the service level provided. These units are as follows:

| Service Level | Relative Value Unit |
|:---:|:---:|
| BLS | 1.00 |
| BLS - Emergency | 1.60 |
| ALS1 | 1.20 |
| ALS1 - Emergency | 1.90 |
| ALS2 | 2.75 |
| SCT | 3.25 |
| PI | 1.75 |

42 C.F.R. §§ 414.605, 414.610(c)(1)(iii). The higher the Relative Value Unit, the more Medicare pays for the service.

99. When medically necessary supplies and services are provided and all other requirements are satisfied, claims may be submitted to Medicare at the following levels of service:

a. Basic Life Support (BLS) (emergency and nonemergency). Ambulance services are provided.

b. Advanced life support, level (ALS1) (emergency and nonemergency). Either a qualifying ALS assessment is performed by an ALS personnel (which is an EMT-Intermediate or EMT-Paramedic under state and local law) as part of an emergency response or at least one ALS intervention occurs.

c. Advance life support, level 2 (ALS2). At least three medications by intravenous push/bolus occurred, or continuous infusion (excluding certain identified solutions); and at least one of the following ALS procedures occurred:

24

       i.        Manual defibrillation/cardioversion;

      ii.        Endotracheal intubation;

     iii.        Central venous line;

     iv.        Cardiac pacing;

      v.        Chest decompression;

     vi.        Surgical airway;

    vii.        Intraosseous line.

d. Paramedic ALS Intercept (PI). (EMT-Paramedic services provided by an entity that does not furnish the ground ambulance transportation in certain rural areas when specified conditions are met).

e. Specialty Care Transport (SCT) (Interfacility transportation of a critically injured or ill beneficiary by a ground ambulance vehicle, including medically necessary supplies and services, at a level of service beyond the scope of the EMT-Paramedic. SCT is necessary when a beneficiary's condition requires ongoing care that must be furnished by one or more health professionals in an appropriate specialty area, for example, nursing, emergency medicine, respiratory care, cardiovascular care, or a paramedic with additional training).

42 C.F.R. §§ 414.605, 410.40(b).

100. To qualify as an emergency service, the ambulance must respond immediately at the BLS or ALS1 level of service to a 911 call or the equivalent in an area without a 911 call system.  An immediate response is one in which the ambulance supplier begins as quickly as possible to take the steps necessary to respond to the call.

25

42 C.F.R. § 414.605. Regardless of how the call is made, "the call is of an emergent nature when, based on the information available to the dispatcher at the time of the call, it is reasonable for the dispatcher to issue an emergency dispatch in light of accepted, standard dispatch protocol." Medicare Benefit Policy Manual, CMS Pub. 100-02, Chap. 10-Ambulance Services, Sec. 30.1.1 (Rev. 130, January 1, 2011). If an emergent dispatch was inconsistent with the standard of protocol or no protocol was used, the beneficiary's condition (for example, symptoms) at the scene determines the appropriate level of payment. *Id.*

101.     When a determination to respond emergently with an ALS ambulance is consistent with the standard dispatch protocol of the local 911 or an equivalent service dispatch protocol, then it is appropriate to bill at an ALS level of service when an ALS assessment is performed by an ALS crew as part of the emergency response. *Id.* But if the ALS emergent dispatch was inconsistent with the standard of protocol, or no protocol was used, the beneficiary's condition (for example, symptoms) at the scene determines the appropriate level of payment. *Id.* Of course, if the ambulance crew arrives at the scene and determines that regardless of the dispatch, the patient lacks medical necessity for ambulance transport, then Medicare will not cover the transport, no matter what type of services were provided.

102.     The ambulance supplier's correct identification of the level of medically necessary ambulance service actually supplied on the claims form is material to Medicare's decision to pay a certain amount for the claim because, as Medicare states, "Since there are marked differences in resources necessary to furnish the various levels of ground ambulance services, different levels of payment are appropriate for the

various levels of service." Ambulance Fee Schedule Public Use Files, available at https://www.cms.gov/Medicare/Medicare-Fee-for- Service-Payment/ AmbulanceFeeSchedule/afspuf.html (accessed April 22, 2019).

### E. Origin and Destination Requirements

103.    Medicare only covers ambulance transports if the destination is a hospital, a critical access hospital ("CAH"), a skilled nursing facility ("SNF"), a beneficiary's home, or a dialysis facility for an end stage renal disease ("ESRD") patient who requires dialysis. Medicare Benefit Policy Manual, CMS Pub. 100-02, Chap. 10-Ambulance Services, Sec. 10.3 (Rev. 115, Nov. 13, 2009). Medicare ambulance coverage is further limited to the following specific origins and destinations:

> (1) From any point of origin to the nearest hospital, CAH, or SNF that is capable of furnishing the required level and type of care for the beneficiary's illness or injury. The hospital or CAH must have available the type of physician or physician specialist needed to treat the beneficiary's condition.

> (2) From a hospital, CAH, or SNF to the beneficiary's home.

> (3) From a SNF to the nearest supplier of medically necessary services not available at the SNF where the beneficiary is a resident, including the return trip.

> (4) For a beneficiary who is receiving renal dialysis for treatment of ESRD, from the beneficiary's home to the nearest facility that furnishes renal dialysis, including the return trip.

42 C.F.R. § 410.40(e).

104.    As a general rule, ambulance service to a physician's office is not covered by Medicare. Ambulance service to a physician's office is only covered if the ambulance transport is "enroute to a Medicare covered destination" and "[d]uring the transport, the ambulance stops at a physician's office because of the patient's dire need for professional

27

attention, and immediately thereafter, the ambulance continues to the covered destination." Medicare Benefit Policy Manual, CMS Pub. 100-02, Chap. 10-Ambulance Services, Sec. 10.3.8 (Rev. 1, Oct. 1, 2003).

105.    Like all other coverage criteria, if the origin and destination requirements are not satisfied, the ambulance supplier will not be paid.  Medicare Benefit Policy Manual, CMS Pub. 100-02, Chap. 10-Ambulance Services, Sec. 10.2.4; Medicare Claims Processing Manual, CMS Pub. 100-04, Chap. 15-Ambulance, Sec. 20.5 (Rev. 1696, Mar. 6, 2009).

## VI.    MEDICAID CONDITIONS OF PAYMENT FOR TRANSPORT OF PATIENTS

106.    Medicaid will reimburse ambulance providers and suppliers for ambulance services provided to Medicaid beneficiaries who are eligible for services at the time of transport.  Ohio Administrative Code 5160-15-01(A)(17)-(18), 15-03(A), 15-03(E)(15).

107.    If the patient is a beneficiary of both the Medicare and Medicaid programs, then Medicare will be the primary payor and Medicaid will only reimburse co-insurance and deductible amounts.  Ohio Administrative Code 5160-15-03(A)(2)(j).

108.    Medicaid only covers medically necessary services.  Ohio Administrative Code 5160-15-03(A)(2)(a).

109.    For nonemergency transport, ambulance services are medically necessary when, based on the patient's condition at the time of transport, one of the following descriptions is satisfied:

    (a)    An individual is nonambulatory and unable to use an ambulette because the individual is unable to get up from bed without assistance; the patient is unable to sit in a chair or wheelchair; and can only be moved only by a stretcher and/or needs to be

28

restrained; or

(b)    An individual is not in a life-threatening situation, but requires continuous medical supervision or treatment during the transport; or

(c)    An individual. . . requires oxygen administration during the transport, and the patient is unable to self-administer or self-regulate the oxygen or the patient requiring oxygen administration has been discharged from a hospital to a nursing facility.

Ohio Administrative Code 5160-15-03(A)(2)(a)(i), (A)(2)(a)(iii)(a)–(c).

110.    For purposes of this rule, a person is "nonambulatory" if they have "permanently or temporarily disabling conditions which preclude transportation in motor vehicle(s) or motor carriers as defined in section 4919.75 of the Revised Code that are not modified or created for transporting a person with a disabling condition. The permanently or temporarily disabling conditions must require transport by air ambulance, ambulance or ambulette (for example, patients requiring stretcher transportation or wheelchair-bound individuals) in accordance with this rule." Ohio Administrative Code 5160-15-01(A)(20).

111.    Unless one of the above criteria is met, nonemergency transportation of patients who are ambulatory at the time of transport are not covered by Ohio Medicaid. Ohio Administrative Code 5160-15-03(E)(8).

112.    Ohio Medicaid only covers ambulance transport if the transport is either to a "Medicaid covered service" or from a "Medicaid covered service," as that term is defined at Ohio Administrative Code 5160-15-01(A)(17). Ohio Administrative Code 5160-15-03(A)(2)(c) (referencing Ohio Administrative Code 5101:3, which was renumbered 5160-15-01, eff. Oct. 1, 2013).

113.    Ohio Medicaid only covers ambulance services if the service is provided from a Medicaid covered point of transport, unless prior authorization is obtained.  Ohio Administrative Code 5160-15-03(A)(2)(d), 15-03(D).

114.    Furthermore, an ambulance provider can bill Ohio Medicaid for ambulance transportation only if Medicaid's documentation requirements are satisfied. Ohio Administrative Code 5160-15-02(E).  Among other requirements, "ambulance and ambulette services must maintain records which fully describe the extent of services provided," and specified documentation must be obtained and maintained by the ambulance provider's billing department before Ohio Medicaid is billed. Ohio Administrative Code 5160-15-02(E)(1).  In addition, Ohio Medicaid will not pay for nonemergency ambulance transport unless, before the claim is filed, a medical practitioner completes a "Practitioner Certification Form" certifying that the ambulance service is medically necessary (with some enumerated exceptions).  Ohio Administrative Code 5160-15-02(E)(4).

## VII.    MOBILE CARE'S SCHEME TO PRESENT AND CAUSE THE PRESENTATION OF FALSE CLAIMS TO GOVERNMENT HEALTHCARE PROGRAMS

115.    Beginning in approximately December 2009 and continuing to the present, Mobile Care knowingly submitted or caused the submission of false or fraudulent claims to Government healthcare programs, and made or caused to be made false records and statements to get claims for ambulance services to Government healthcare programs paid.

116.    Mobile Care's scheme involved billing Government healthcare programs for ambulance transport when no medical necessity was present and/or documented.

117.    After Relator White began training employees concerning the applicable legal requirements, Mobile Care began pressuring its employees at all levels either to create false documentation to support false claims, or to submit false claims unsupported by any documentation—all with the end result of billing the Government for expensive ambulance transportation that was medically unnecessary, that was up-coded to a higher charge for no medically necessary reason, or that failed to satisfy other Government billing requirements.

## A.    Relator Brandee White's Efforts to Stop Mobile Care's Scheme Were Unsuccessful

118.    When Relator White was hired in February 2014, Mobile Care's billers told her that they did not have a copy of the applicable Medicare ambulance regulations.

119.    At the time of her hiring, Relator White discovered that Mobile Care's Patient Care Reports for nonemergency transportation routinely lacked details regarding the patient and routinely lacked any information demonstrating that the patients had the medical necessity required to bill Government healthcare programs for ambulance transportation.

120.    For example, Patient Care Reports for nonemergency transportation of patients to dialysis clinics typically only stated that the patient was picked up at their facility, was put on a stretcher, was taken to the dialysis facility, and was transferred to the dialysis nurse.  This description does not demonstrate medical necessity for ambulance transport.

121.    As the Mobile Care employee responsible for ensuring compliance with the law and for compliance training, Relator Brandee White made numerous efforts to train

Mobile Care's officers, employees, and managers in proper ambulance documentation and billing procedures, including medical necessity requirements, patient signature requirements, and physician certification requirements.

122.    However, Mobile Care's other employees and managers continued with Mobile Care's schemes to bill improperly Government healthcare programs for ambulance services that were not medically necessary or that otherwise did not meet requirements for billing Government healthcare programs for ambulance services.

123.    Mobile Care demonstrated that though they knew what the law required, they nevertheless intended to continue to submit false claims for ambulance services that lacked medical necessity or that otherwise did not meet the requirements for billing Government healthcare programs for ambulance services.

124.    After Relator White began training Mobile Care's paramedics, EMTs, billers, and other employees concerning the requirement for medical necessity and other billing requirements of Government healthcare programs, Mobile Care began to lose money due to a reduction in its billings.  In particular, after some of Mobile Care's dialysis patients were switched from ambulance transportation to ambulette van transportation, Mobile Care received reduced income as a result of legal compliance with Government healthcare program billing requirements.

125.    Mobile Care fully understood that legal compliance would lead to reduced income.  By email to Relator White dated April 29, 2015, Eric McAllister, Mobile Care's Director of Medical Transportation Services, informed Relator White that Mobile Care would not be 100% compliant with Medicare's requirements for ambulance billing, stating:

32

"Again, I realize we cannot operate at 100% compliance as we will be out of business."

126.    Then, demonstrating his knowledge that Mobile Care's false claims to Government healthcare programs violate the False Claim Act, in the same email Mr. McAllister states that too little compliance might be an issue because a whistleblower might file a False Claims Act suit seeking a reward:

"However; if we are 80% or less that could cause harm to us also. We need to operate at the 80%-90% on EMS documentation/compliance.  All that is needed is a disgruntled employee (whistleblower) to make some false claim.

By the way; whistleblowers are entitled to a certain percentage of what is collected."

To illustrate his point, Mr. McAllister provided a link to a local newspaper article discussing a False Claims Act lawsuit filed by the Department of Justice against a long-term care provider based in Toledo, Ohio.

127.    Relator White asked Mr. McAllister what he meant by his email, and by reply of April 30, 2015, Mr. McAllister reiterated his belief that Defendants should continue to submit false claims, stating:

"We need to be at 85-90% compliance regarding billing those runs. Not every single run will have every key detail in it, but on ones that are close, we need to bill, period."

128.    In a meeting that occurred on approximately June 1, 2015, Joe Wallace announced to the Mobile Care Billing and Collections Staff (including both Relator White and Relator Cunningham), that Mobile Care would attempt to achieve only 80% to 90% compliance with Medicare's requirements for ambulance transport.  At the same meeting, Joe Wallace announced Relator White's demotion and further announced Eric McAllister would take over Relator White's former management position for billing and

33

billing compliance.

129.    Relator White continued to insist that claims to Medicare for ambulance transport be billed to Government healthcare programs only if medical necessity both existed and was documented, and also that all other payment requirements were satisfied.  Mobile Care continued to lose money due to Relator White's insistence that Mobile Care's claims to Government healthcare programs comply with all program requirements, be truthful, and not be false.

130.    Despite Relator White's continued efforts to stop the Mobile Care's presentation of false claims for ambulance services, Mobile Care continued to present and cause the presentation of false claims for ambulance transportation to Government healthcare programs.

131.    In retaliation for Relator White's efforts to stop the Mobile Care's continued violations of the False Claims Act by bringing Defendants into compliance with prerequisite requirements for billing Government healthcare programs for ambulance services, Defendant Mobile Care retaliated against and demoted Relator White, and then eventually fired her on August 17, 2015.

132.    Fully aware that Relator White knew the Mobile Care's history of submitting false claims in violation of the False Claims Act, Joe Wallace offered a cash payment to Relator White at the time that he fired her in exchange for Relator White's agreement not to disclose such history.  Specifically, Joe Wallace offered Relator White the following: If Relator White agreed (among other things) to give up any right to collect a relator's share in a False Claims Act case, to never "do or say anything that would potentially harm the business or reputation of [Mobile Care Group]," and to

return all Mobile Care documents in her possession—including documents that demonstrate Mobile Care's knowledge that its business practice depends on violating the False Claims Act—then Mobile Care would pay Relator White $15,000.00. Relator White refused the offer.

### B.   Pressure Applied to Mobile Care Emergency Medicine Technicians

133.   Mobile Care improperly and illegally directed its Emergency Medicine Technicians (EMTs) who transport patients in ambulances to add specific statements and words to their Patient Care Reports in order to create the impression that the patients had a medically necessary reason requiring them to be transported in an ambulance so that Mobile Care could improperly bill Government healthcare programs for ambulance transport.

134.   Even when such words and phrases were insufficient to show medical necessity for ambulance transport, Mobile Care instructed its billers to submit such claims to Government healthcare programs for ambulance transportation.

### 1.   Summer 2014 Meeting

135.   In the summer of 2014, Eric McAllister and Matt Miller, Mobile Care's EMS Operations Manager, held a mandatory meeting at a Mobile Care garage for all Mobile Care EMTs. Mobile Care owner Joe Wallace attended this meeting as well.

136.   Relator Wisler and all of the other Mobile Care EMTs who attended the meeting were told by these Mobile Care managers to put the words "poor trunk control" in their Patient Care Reports for all dialysis patients notwithstanding the patients' actual condition.

35

137.   A determination that a patient has "poor trunk control" does not automatically support medical necessity for ambulance services.  A patient with "poor trunk control" might still be able to be safely transported in a wheelchair by ambulette.  Thus, to support the medical necessity for ambulance service, there must be a determination that the patient has additional symptoms beyond "poor trunk control" in order to justify transportation in an ambulance, and those additional symptoms must be documented in the Patient Care Report.

### 2.   April 2015 Meetings

138.   Mobile Care instructed its paramedics and EMTs to attend one of two scheduled mandatory meetings on April 11 or April 18, 2015.  Relator Wisler attended the April 18, 2015 meeting.

139.   At the April 18, 2015 meeting, Mobile Care EMS Lieutenant Chad Jendrzejak told the paramedics and EMTs that when transporting patients on an emergency basis, every patient over the age of 50 should be given intravenous fluids and should have a cardiac monitor applied.

140.   Automatic intravenous fluids and cardiac monitors for all patients over the age of 50 are not automatically medically necessary because not every patient over the age of 50 medically requires this treatment.

141.   In addition to using automatic intravenous fluids and cardiac monitors for patients over 50 to support use of ambulance transport, Mobile Care was also able to use such medical procedures to bill for the higher reimbursed Advanced Life Support (ALS) services rather than the lower reimbursed Basic Life Support (BLS) services.

142.   At the April 18, 2015 meeting, Mr. Jendrzejak also told the paramedics and

36

EMTs that they must justify using a stretcher for transporting patients in order to bill Medicare for ambulance services rather than ambulette services.

143.    Regarding Mobile Care's profitable transportation of dialysis patients, Mr. Jendrzejak told the paramedics and EMTs to include in their Patient Care Reports statements that such dialysis patients need ambulance transport due to history of stroke, diabetes, and hypertension.  Mr. Jendrzejak told the paramedics and EMTs to write this in their reports for every patient for every run, so that Medicare and Medicaid could be billed for ambulance transport.

144.    In August 2015, one of Relator Wisler's colleagues failed to follow this directive and was instructed by Mr. Jendrzejak to amend a Patient Care Report to falsely state that the dialysis patient had a history of stroke (even though she knew that the patient had no history of stroke), so that the patient's transport could be billed to Medicare.

145.    Furthermore, Mr. Jendrzejak reminded paramedics and EMTs that their paychecks and jobs depended on money coming in.  A slide in his presentation states in part:

> "Remember, every run is essentially your pay check.  If billing cannot send bills out so our collectors can collect it, money will not come in. If money doesn't come in, we are forced to make cuts, Period. Document what you see, find, hear and do etc... NEVER worry about billing, only concern yourselves with YOURSELF, Your Partner, and finally Your Patient. Billing will work itself out."

146.    Even though Mr. Jendrzejak stated in this slide that paramedics and EMTs did not need to worry about billing, this was contradicted by the prior two sentences, which said that the paramedics and EMTs would not get paid if the billing department

37

could not submit bills to the Government that were supported by documentation.

147.    Due to Mr. Jendrzejak's statements and physical intimidation tactics during the April 18, 2015 meeting, the paramedics and EMTs understood that Mobile Care wanted them to falsely state that patients had medical necessity for ambulance transport even when there was no such medical necessity.

148.    Also at the April 18, 2015 meeting, the Mobile Care managers stated that ambulance transport of these dialysis patients is the primary money-making business of Mobile Care, and that Mobile Care cannot replace its failing patient care monitors and aging ambulances without this income.

149.    Relator Wisler has been told by Mobile Care management that Mobile Care can earn up to $106,000.00 per year transporting one dialysis patient by ambulance.  By contrast, Ohio Medicaid only pays on average $30.00 per trip to transport patients by ambulette in their wheelchairs, which equates to approximately $9,360.00 per year.

### C.    Pressure Applied to Mobile Care Billers

150.    Mobile Care routinely pressured their billers, including Relator Cunningham, to submit all claims for ambulance transportation to Government healthcare programs for payment, even though no medical necessity justifying such claims is documented and/or the claims otherwise do not meet prerequisite requirements for billing Government healthcare programs, such as due to failure to meet physician certification and/or patient signature requirements.

151.    Chad Jendrzejak told Relator Cunningham that Mobile Care could not be 100% compliant with the requirements of Government healthcare programs for billing for ambulance transportation.

38

152.     When Relator Cunningham refused to bill claims for ambulance transportation when the Patient Care Report shows no medical necessity, Eric McAllister instructed another biller to submit those claims for payment for ambulance services to Government healthcare programs anyway.

153.     Relator Cunningham also observed that for many ambulance transports, the patient did not have a timely physician certification, as required by Medicare regulation to bill for ambulance transport.  Also for many ambulance transports, Relator Cunningham observed that a signature from the patient or authorized other person was not present in accord with Medicare's patient signature requirements. When this occurred, Relator Cunningham was directed by Eric McAllister to bill submit the claims for payment for ambulance services to Government healthcare programs anyway.  When Relator Cunningham refused, Mr. McAllister directed another biller to submit those claims for payment for ambulance services to Government healthcare programs anyway.

## VIII. DEFENDANT LOGISTICARE SOLUTIONS' SCHEME TO CAUSE THE PRESENTATION OF FALSE CLAIMS TO FEDERAL HEALTHCARE PROGRAMS

154.     As a broker of nonemergency transportation services for Medicare Advantage Plans and State Medicaid Plans, Defendant LogistiCare Solutions, LLC is well aware of the regulations governing payment for ambulance services by Government healthcare programs, including the medical necessity and other coverage requirements described in this Second Amended Complaint and their materiality to the Government.

155.     LogistiCare is paid by all these programs to arrange for ambulance, ambulette, or other transportation for beneficiaries of Government healthcare programs.

156.    Aetna Better Health of Ohio ("Aetna") is a private entity that administers a Government-funded managed care plan for the MyCare Ohio Program.  Aetna offers the MyCare Ohio plan in the counties listed above in Section IV.C.  LogistiCare contracts with Aetna and other plan administrators to broker ambulance services for all Government healthcare program beneficiaries enrolled in their Government-funded managed care plans.

157.    The Aetna MyCare Ohio Program is located at 7400 W. Campus Rd. New Albany, OH 43054.

158.    LogistiCare is responsible for monitoring, tracking and scheduling transport services and ensuring that services billed to MyCare Ohio and other Government-funded Medicare Advantage and Medicaid plans are accurate and correct.

159.    When nursing facilities, skilled nursing facilities, or others request ambulance transport for beneficiaries of Government healthcare programs, they contact LogistiCare and LogistiCare schedules such transportation by arranging an ambulance provider or supplier, like Mobile Care, to provide such transportation.

160.    But through its system-wide business practices, LogistiCare requires ambulance companies to provide ambulance transportation and bill as if the ambulance transportation was medically necessary even when it is not.

161.    LogistiCare routinely schedules Government healthcare program beneficiaries to be transported by ambulance on a nonemergency basis where no medical necessity exists for ambulance transportation.

162.    LogistiCare's stated policy is that if the ambulance arrives to pick up the patient and finds that medical necessity to transport the patient by ambulance is not

40

present, the ambulance provider or supplier should call LogistiCare. But this stated policy is ineffective because it is not reliably followed.

163. During her time at Mobile Care, Relator White made numerous attempts to contact LogistiCare in situations where no medical necessity existed for transportation of beneficiaries of the MyCare Ohio program administered by Aetna, by calling LogistiCare's provider line, LogistiCare's transportation supervisor, LogistiCare's transportation manager, and LogistiCare's quality assurance department. These LogistiCare departments and entities routinely do not answer their phones or return calls.

164. When Relator White has reached a LogistiCare representative in Wisconsin or in Arizona, she has been told that ambulance transportation is appropriate and can be billed as ambulance transportation because "Aetna approved it." But in Relator White's experience, this prior approval from Aetna is based solely on what LogistiCare tells Aetna over the phone and Aetna typically does not independently review patient files to make such determinations.

165. Aetna's preapproval as obtained by LogistiCare is not a determination regarding whether medical necessity exists for transportation of the patient. Aetna's Provider Relations manager stated as much to Relator White and also so advised LogistiCare by email of March 31, 2015.

166. Notwithstanding Aetna's preapproval (or the approval of any other plan administrator), the ambulance provider is still responsible for assessing whether the medical necessity to bill the MyCare Ohio program for the patient's transportation by ambulance is present or documented.

41

167.    Thus, by relying solely on plan administrator preapproval as support for medical necessity, LogistiCare has a practice and policy of directing ambulance transport companies to bill Government healthcare programs for ambulance transportation even when medical necessity is not present.

168.    Moreover, LogistiCare has also unilaterally waived the medical necessity requirement for the MyCare Ohio program.

169.    On July 22, 2015, Eric McAllister emailed LogistiCare, asking LogistiCare to confirm that Mobile Care was to bill the MyCare Ohio program for BLS and ALS transport arranged by LogistiCare in the absence of medical necessity:

> "Also, we are still transporting patients via stretcher even if they do NOT meet medical necessity correct?  Meaning, if a run is called in BLS or ALS by Logisticare [which are requests for ambulance transportation] and our crew determines that medical necessity is not met, we are to still transport and bill accordingly?"

170.    LogistiCare's response confirmed that Mobile Care was supposed to ignore the medical necessity requirements and bill the MyCare Ohio program for ambulance transportation anyway, stating:

> "We are still working with Aetna to find a long term solution for this issue. In the meantime, please provide the transportation and bill accordingly."

171.    Indicating Mobile Care's willingness to go along with this scheme, Mr. McAllister then emailed Relator White, Relator Cunningham, and other Mobile Care employees stating:

> "Please see the email string below- We now have it in writing and confirmed that medical necessity for right now doesn't matter."

172.    But neither LogistiCare nor Mobile Care nor any other ambulance supplier has any authority to waive medical necessity requirements and bill MyCare Ohio or any

other plan for nonemergency ambulance transportation where medical necessity does not exist.

173.    Following Relator White's termination by Mobile Care, Relator Cunningham continued observing LogistiCare's policy and practice of arranging for nonemergency ambulance transports of patients who were not bed-confined and who did not medically require such transports.

174.    Thus, through its policies and practices, Defendant LogistiCare has caused the submission of false claims for ambulance transportation to Government healthcare programs.

175.    Given the nearly nationwide scope of LogistiCare's contracts with plan administrators for Medicaid and Medicare Advantage programs, and that Relator White's contacts with LogistiCare have been with employees whose scope of responsibility is not limited to the state of Ohio and the MyCare Ohio program, on information and belief, LogistiCare's scheme is nationwide in scope. Various of the LogisitiCare representatives that Relator White dealt with had authority over Ohio, Illinois, and Wisconsin markets.

176.    LogistiCare's scheme to violate the False Claims Act began at least by June 1, 2014 in Ohio when the MyCare Ohio program began operating. On information and belief, for the reasons discussed in the preceding paragraph, LogistiCare's False Claims Act violations were occurring in other states prior to that date.

## IX.    PUBLIC HEALTH AND SAFETY IS AFFECTED BY DEFENDANTS' FRAUDULENT ACTIONS

177.    Defendants' actions pose a hazard to public health and safety. When

ambulance crews are busy transporting patients who do not meet the regulatory requirements to bill Government healthcare programs for ambulance services, they cannot transport patients who truly require ambulance transport.

178.    Often, patients who urgently require emergency ambulance transportation have had to wait while ambulance crews transport or complete transport of patients who do not meet regulatory requirements to bill Government healthcare programs for provided ambulance services.

## X.    EXAMPLES

179.    The following are examples of Defendants' scheme to defraud the United States Government by presenting or causing the presentation of false claims for payment of ambulance services that did not meet the prerequisites conditions of payment for such claims.

### A.    Example 1

180.    On May 7, 2015, Patient 1 was transported by ambulance from a hospital in Ohio to a nursing facility in Ohio, where Patient 1 had just been treated for "Altered Mental Status."  The Patient Care Report written by Mobile Care's EMT provided no medically necessary reason for the ambulance transport.  Rather, the patient "rested comfortable" during the transport and "remained stable."

181.    In her role as a Mobile Care biller, Relator Cunningham reviewed the EMT's Patient Care Report for this trip and observed no medical necessity justifying transport by ambulance.  Relator Cunningham provided Relator White with this Patient Care Report for her review as Mobile Care's manager responsible for compliance.

182.    Relator White emailed Matt Miller and Eric McAllister on May 8, 2015

44

regarding this transport. Mr. McAllister responded on May 11, 2015 that the EMT could correct the report by changing the report from stating that the patient is "on [oxygen]" so that it stated instead that the patient is "on [oxygen] . . . and cannot regulate their own [oxygen]."

183. The fact that a patient is **on oxygen** is not enough to create the medical necessity needed to bill Medicare for ambulance transport under Medicare regulations and guidance. But the fact that a patient is **unable to regulate their oxygen** may warrant ambulance transport.

184. Without taking any steps to verify whether Patient 1 actually was unable to regulate her own oxygen, Eric McAllister directed Mobile Care's information technology director to alter the patient's medical record in an email dated May 11, 2015, stating:

> "Any chance you can do this on the back end? If not, let me know and I will have Matt [Miller] advise John [the EMT] he needs to correct it. Simple fix, just delete the patient requires stretcher due to line and add something about patient not being able to regulate their own O2. Easy peasy."

185. That same day, Mobile Care's information technology officer made the change, thereby changing the patient's medical record to falsely state the patient was unable to regulate her own oxygen.

186. Having falsely altered its records, on May 12, 2015, Mobile Care submitted or caused the submission of a false claim for $599.18 for this ambulance transportation to the Medicare program. On May 28, 2015, Medicare's Ohio contractor CGS Administrators paid Mobile Care $254.26 for Patient 1's medically unnecessary ambulance transport on May 7, 2015.

45

**B.    Example 2**

187.    On December 10, 2013, Mobile Care began transporting Patient 2, a patient with end stage renal disease, from a nursing facility in Ohio where she resides, to a dialysis facility in Ohio.

188.    When the Mobile Care EMTs arrived at the nursing facility to pick up Patient 2, she was sitting in her wheelchair, ready for transport to her dialysis facility. When a patient is found ready for transport in a wheelchair, that is a clear indication that the patient is not at risk from falling from her wheelchair, the patient is not bedridden, and transport by stretcher in an ambulance is not medically necessary.  The only reason provided as to why transport by ambulance was required is "weakness and obesity" and "risk of falls."  But absent information as to why the patient is at risk of falling out of a wheelchair, "risk of falls" simply means that the patient is a fall risk if they walk.  Thus, the justification provided by Mobile Care was not sufficient to demonstrate that it was medically necessary to transport Patient 2 by ambulance instead of in her wheelchair by ambulette van.

189.    Nevertheless, Mobile Care transported Patient 2 to and from her dialysis facility on December 10, 2013 in an ambulance.

190.    After this initial transport, Mobile Care knew that no medically necessary reason justified billing Medicare for Patient 2 to be transported by ambulance. Nevertheless, Mobile Care continued to transport Patient 2 by ambulance to and from her dialysis facility on December 12, 2013, December 14, 2013, and December 17, 2013.

191.    The December 10, 2013 and December 14, 2013 transports of Patient 2 were listed on a spreadsheet maintained by Mobile Care Billers that listed ambulance

46

transports for which no medical necessity existed to bill Government healthcare programs for ambulance transportation. This spreadsheet was given to Mobile Care management. Nevertheless, these ambulance transports were billed to the Medicare Part B program anyway.

192. In addition to the ambulance provider's own duty to ascertain the medical necessity of any ambulance transportation, as discussed above in paragraphs 82–85, Medicare Part B requires a written order from the patient's attending physician or other caregiver certifying that the medical necessity requirements are met. 42 C.F.R. § 410.40(d)(2)(i). For repetitive nonemergency ambulance transportation, the certification must be dated no earlier than 60 days prior to the transport. *Id.* If the transportation is "unscheduled," the certification can be obtained within 48 hours after the transportation.

193. According to Mobile Care's electronic record, no timely ambulance certification existed for Patient 2 for her December 2013 ambulance transportation. In fact, on December 12, 2013, a Certified Nurse Practitioner provided an ambulette certification for Patient 2.

194. Mobile Care submitted or caused the submission of a false claim for payment in the amount of $507.53 to the Medicare Part B program for each one of these eight transports of Patient 2 by ambulance. Through Medicare Part B Contractor CGS Administrators, Mobile Care was paid $177.17 for each of these eight ambulance transports of Patient 2, for a total of $1,417.36.

## C. Example 3

195. Between April 14, 2014 and July 23, 2015, Patient 3 has been transported

47

by Mobile Care 164 times from her nursing facility in Ohio in her wheelchair by ambulette van.

196.    As Patient 3 has end stage renal disease, she needs to be transported to a dialysis facility in Ohio several days a week.

197.    Even though Patient 3 is typically able to travel in her wheelchair in an ambulette van, on approximately October 17, 2014, her nursing home asked that Patient 3 be transported by ambulance to dialysis, not because Patient 3 required transport by ambulance, but because the dialysis facility did not want to move Patient 3 from her wheelchair into a dialysis chair, even though the dialysis facility has special equipment to mechanically move patients in Patient 3's physical condition.

198.    On October 17, 2014, when the ambulance crew arrived to pick up Patient 3 to take her to dialysis, they found her sitting in her wheelchair.  They transferred her onto a stretcher.  She sat up on the stretcher for comfort rather than lying down on it. Patient 3 was transported to and from her dialysis treatment on October 17, 2014 by ambulance.

199.    Relator White contacted CMS in November 2014, to ask whether the medical necessity for Medicare to pay for ambulance transportation is present when dialysis treatment centers and doctors' offices require that patients be transported by ambulance so that they would not need to lift patients.  CMS informed Relator White that such patients would not meet Medicare's medical necessity requirements.  Relator White advised Eric McAllister of CMS's response to her email question on this issue.

200.    With full knowledge that Patient 3 did not require ambulance transport, on dozens of occasions from February 2015 to the present, Mobile Care nevertheless

transported Patient 3 in an ambulance and billed both Medicare Part B and the MyCare Ohio program for this transport.

201.    In addition, because LogistiCare began brokering transport for Patient 3 and requested that Mobile Care transport Patient 3 by ambulance, on February 20, 2015, March 2, 2015, March 17, 2015, March 31, 2015, and April 15, 2015, Relator White contacted LogistiCare either by phone or by email to advise that Patient 3 does not have the medical necessity needed to bill the MyCare Ohio program for transport by ambulance for her routine non-emergency transport.  On March 18, 2015, Relator White forwarded the instruction she had received from CMS to LogistiCare that such patients do not meet Medicare's definition of medical necessity solely due to their weight.

202.    After the February 20, 2015 and March 18, 2015 contacts, LogistiCare temporarily changed Patient 3's transportation to ambulette and then Mobile Care transported Patient 3 in her wheelchair by ambulette.  But then LogistiCare returned to scheduling Patient 3 for ambulance transportation shortly thereafter, despite its knowledge that Patient 3 lacked the medical necessity needed to bill MyCare Ohio for ambulance transport.

203.    For example, Mobile Care submitted or caused the submission of false claims for $620.63 to the Medicare Part B program for each of two ambulance transports of Patient 3 on October 17, 2014.  Medicare Part B Contractor CGS Administrators then paid Mobile Care for each of these two ambulance transports.

204.    As additional examples, Mobile Care and LogistiCare submitted or caused the submission of false claims for payment to the MyCare Ohio program for $625.50 for each of two transports of Patient 3 by ambulance on April 10, 2015.  MyCare Ohio,

through LogistiCare, paid Mobile Care $275.16 for each of these two ambulance transports on April 10, 2015.

**D.     Example 4**

205.    Patient 4 is a middle-aged patient with multiple sclerosis.  He frequently travels from the nursing facility where he resides in his wheelchair via ambulette van. For example, on both December 2, 2013 and January 9, 2014, Mobile Care transported Patient 4 from his nursing facility in Ohio to and from doctor appointments in an ambulette van.

206.    On December 18, 2013, Eric McAllister and Matt Miller arrived at Patient 4's nursing facility to transport him.  When they arrived, Patient 4 was sitting in his wheelchair.  Nevertheless, Mr. McAllister and Mr. Miller transferred Patient 4 onto a stretcher using a mechanical lift and transported him to a hospital in Ohio for a surgical consultation via ambulance.  After the appointment, they transported him back to his nursing facility in their ambulance.  Upon his arrival, the patient was lifted back into his wheelchair.

207.    Likewise, on December 31, 2013, Mobile Care transported Patient 4 from the hospital back to his nursing facility in an ambulance.

208.    Mobile Care's Patient Care Reports for Patient 4 for these ambulance transports on December 18, 2013 and December 31, 2013 show no medically necessary reason that Patient 4 required ambulance transport.

209.    The December 31, 2013 transport of Patient 4 was listed on a spreadsheet maintained by the Mobile Care's billers that listed ambulance transports for which no medical necessity existed to bill Government healthcare programs for ambulance

transportation.  This spreadsheet was given to Mobile Care management.

210.     Nevertheless, Mobile Care submitted or caused the submission of false claims to Medicare Part B for this treatment.

211.     On February 5, 2014, Medicare's Ohio contractor CGS Administrators paid Mobile Care $181.28 for Patient 4's medically unnecessary ambulance transport on December 31, 2013.

**E.     Example 5**

212.     Patient 5 wears a walking boot due to a fractured right ankle.  She also has a wound in her right knee where her knee had to be drained following a knee replacement surgery.

213.     On June 4, 2015, June 15, 2015, and June 29, 2015, Mobile Care transported Patient 5 from the nursing facility where she resides in Ohio to doctor appointments in Ohio and then back to her facility.  These ambulance transports were brokered by LogistiCare.

214.     A Mobile Care Patient Care Report dated June 4, 2015 indicates that Patient 5 is non-weight bearing on her **right leg** until after her fracture heals.  The same Patient Care Report states that as long as Patient 5 does not move her ankle, her pain is a 1-2, which is a minimal level.

215.     However, as a Mobile Care Patient Care Report for June 15, 2015 indicates, nothing prevents Patient 5 from putting weight on her **left foot**.  On June 15, 2015, the Mobile Care EMTs arrived at Patient 5's facility to find her sitting up.  Patient 5 stood up and pivoted on her left leg as she was transferred onto the stretcher.

216.     Likewise, on June 29, 2015, Patient 5 stood up and pivoted on her left foot

as she was transferred onto the stretcher.  She denied any pain, except "on movement or palpation."

217.    Given her ability to stand on her non-fractured foot, and the fact that her pain level is not great enough to justify ambulance transport, for all six of her transports there was no medically necessary reason for Patient 5 to be transported by ambulance instead of in a wheelchair by ambulette van.

218.    Nevertheless, on each occasion, Mobile Care transported Patient 5 by ambulance and billed the MyCare Ohio program for these medically unnecessary ambulance transports.

219.    Relator White attempted to contact LogistiCare numerous times to report that this patient does not meet medical necessity requirements.  LogistiCare either stated that "Aetna approved it" or did not respond to Relator White.  Relator White then contacted Aetna directly, and at Aetna's request faxed the Patient Care Reports to Aetna.

220.    After reviewing the Patient Care Reports for Patient 5, on July 1, 2015, Aetna told Relator White that Patient 5 "does not meet the medical necessity for stretcher."

221.    On July 9, 2015, at Aetna's direction, Relator White called and spoke with Patient 5's nursing facility, informing them that from that point forward, Patient 5 would have to be transported by ambulette.

222.    Nevertheless, Mobile Care again transported Patient 5 by ambulance on August 5, 2015 and then submitted a paper claim on CMS Form 1500 to LogistiCare for payment of $508.50 from the MyCare Ohio program, even though Relator Cunningham alerted Eric McAllister that Patient 5's wheelchair was in the room when the ambulance

arrived to take her to her doctor appointment.

223.   Mobile Care also submitted false claims to LogistiCare for payment by the MyCare Ohio program for ambulance transport of Patient 5 on June 4, 2015 (two claims for $508.50 each); on June 15, 2015 (two claims for $508.50 each); and on June 29, 2015 (two claims for $498.75 each).

## COUNT ONE
### False Claims Act: Presentation of False Claims in Violation of 31 U.S.C. § 3729(a)(1)(A)

224.   Relators reallege and incorporate the preceding paragraphs as if set forth fully herein.

225.   Defendants, by and through their officers, members, agents, and employees authorized its various officers, members, agents, and employees to take the actions relating to the conduct alleged above.

226.   By presenting or causing to be presented claims for payment to Government healthcare program knowing that the United States' prerequisite requirements for such claims to be paid were not met (including that patients lacked the medical necessity required to bill for ambulance services), Defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval to the United States and/or the United States' contractors, grantees, or other recipients in violation of 31 U.S.C. § 3729(a)(1)(A).

227.   As a result, the United States suffered actual damages in an amount to be determined at trial.

**COUNT TWO**
**False Claims Act: False Records or Statements**
**in Violation of 31 U.S.C. § 3729(a)(1)(B)**

228.   Relators reallege and incorporate the preceding paragraphs as if set forth fully herein.

229.   Defendants, by and through their officers, members, agents, and employees authorized its various officers, members, agents, and employees to take the actions relating to the conduct alleged above.

230.   By making or causing to be made false statements that ambulance services met the United States' prerequisite requirements for such claims to be paid knowing that in fact such requirements were not met (including that patients lacked the medical necessity required to bill for ambulance services), Defendants knowingly made or used or caused to be made or used false records or statements material to false or fraudulent claims, in violation of 31 U.S.C. § 3729(a)(1)(B).

231.   As a result, the United States suffered actual damages in an amount to be determined at trial.

**COUNT THREE**
**False Claims Act: Retaliatory Actions**
**in Violation of 31 U.S.C. § 3730(h)**

232.   Relator White realleges and incorporates the preceding paragraphs as if set forth fully herein.

233.   Defendant Mobile Care EMS & Transport, Inc. had notice of Relator White's protected activity.

234.   Due to her lawful acts and other efforts to stop Defendant Mobile Care EMS & Transport, Inc.'s violations of the False Claims Act, Defendant Mobile Care EMS

& Transport, Inc. illegally retaliated against Relator White in violation of 31 U.S.C. § 3730(h)(1) by discriminating against her in the terms and conditions of her employment, including by demoting her and then terminating her.

235.    Due to her efforts to stop Mobile Care Defendant Mobile Care EMS & Transport, Inc.'s violations of the False Claims Act as described in this Second Amended Complaint,  Relator White engaged in activity protected by 31 U.S.C. § 3730(h)(1).

236.    Defendant Mobile Care EMS & Transport, Inc. reasonably knew that Relator White was engaging in protected activity for reasons including that Defendant Mobile Care EMS & Transport, Inc. knew that its own business practice included the submission of or causing the submission of claims to Government healthcare programs and Relator White regularly informed Defendant that these claims were not legally compliant with requirements of the Government healthcare programs.  In fact, Defendant actually knew of such claims' noncompliance, as demonstrated by the admissions of Joe Wallace and Eric McAllister to Relator White.   And as also demonstrated by an admission of Eric McAllister to Relator White, Defendant Mobile Care EMS & Transport, Inc. knew its violations of violations of Government healthcare program requirements were or could be a violation of the False Claims Act.

237.    Nevertheless, Defendant Mobile Care EMS & Transport, Inc. discriminated against Relator White because of her efforts to stop Mobile Care EMC & Transport, Inc.'s violations of the False Claims Act.

238.    Therefore, pursuant to 31 U.S.C. § 3730(h), Relator White is entitled to all relief necessary to make her whole, including reinstatement with the same seniority status that she would have had but for the discrimination, front pay, two times the

amount of back pay, interest on the back pay, and compensation for all special damages sustained, including litigation costs and attorneys fees.

## COUNT FOUR
### Pendant Ohio Revised Code 4113.52(A)(3) Claim

239. The allegations in the preceding paragraphs are realleged as if fully set forth below.

240. Defendant Mobile Care EMS & Transport, Inc. has a duty under Ohio Revised Code 4113.52(A)(3) to refrain from taking disciplinary or retaliatory actions against employees who report potential violations of law likely to cause an imminent risk of physical harm to persons, which are a hazard to public health or safety, or which may be a felony.

241. Relator White was aware that Defendant Mobile Care EMS & Transport, Inc.'s actions violated federal regulatory requirements for presenting claims for payment for ambulance services to Government healthcare programs and violated the federal False Claims Act.

242. Relator White reasonably believed that these violations were a criminal offense likely to cause an imminent risk of physical harm to persons, a hazard to public health or safety, and/or constituted a felony.

243. Mobile Care have contracts with Lucas County, Ohio to transport patients who request emergency help through the 911 system. Mobile Care also have contracts with nursing facilities to transport patients who need emergency transportation.

244. When Mobile Care's ambulances are busy transporting patients, including patients who lack medical necessity for ambulance transportation, they must sometimes

delay transport of patients who do require ambulance transportation, including patients who need emergency ambulance transportation. Therefore, Relator White reasonably believed that these violations were likely to cause an imminent risk of physical harm to persons and/or a hazard to public health or safety and/or constituted a felony.

245. In fact, because Defendant Mobile Care EMS & Transport, Inc. violated Ohio Revised Code 2921.13(A)(9) and the total value of the property it stole is more than $7,500.00, Defendant Mobile Care EMS & Transport, Inc.'s actions may be a felony under Ohio law.

246. Relator White reported potential violations of the law to her supervisors at Defendant Mobile Care EMS & Transport, Inc., Joseph Wallace and Eric McAllister, who had authority to correct these violations.

247. From time to time, Relator White orally notified Joe Wallace and Eric McAllister that the Mobile Care's practices and policies would result in presentation of bills to Government healthcare programs by their employees that did not comply with requirements for billing those programs for ambulance services. Presenting such false claims for payment to the Government healthcare programs was illegal because it violated federal regulations, the federal False Claims Act, and Ohio Revised Code 2921.13(A)(3), (A)(4), (A)(9), and (A)(11). Relator White often followed up by emailing Mr. Wallace and/or Mr. McAllister to state why the Mobile Care's policies and practices were illegal. Relator White's emails constituted written reports sufficient to identify and describe the violations.

248. Relator White made a reasonable and good faith effort to determine the accuracy of her reports to Defendant Mobile Care EMS & Transport, Inc., including

carefully studying Mobile Care's documentation, the applicable regulations, and by making an inquiry to CMS.

249.    Due to Relator White's reports and her efforts and actions to ensure the accuracy of the information that she reported, Defendant Mobile Care EMS & Transport, Inc. took disciplinary and retaliatory action against Relator White in violation of Ohio Revised Code 4113.52

250.    Defendant Mobile Care EMS & Transport, Inc.'s retaliation included: suspending Relator White from employment, withholding salary increases or other employee benefits to which she was otherwise entitled, reassigning her, reducing her position, and removing her from employment.

251.    Therefore, pursuant to Ohio Revised Code 4113.52(E), Relator White is entitled to all relief the Court may determine appropriate, including reinstatement to the same position that she held at the time of the disciplinary or retaliatory action, the payment of back wages, full reinstatement of fringe benefits, and seniority rights, as well as reasonable attorney's fees, witness fees, and fees for experts who testify at trial.

252.    As Defendant Mobile Care EMS & Transport, Inc.'s retaliation was deliberate, Relator White is also entitled to interest on any award of back pay.

**COUNT FIVE**
**Pendant Ohio Public Policy Tort Claim**

253.    The allegations in the preceding paragraphs are realleged as if fully set forth below.

254.    Defendant Mobile Care EMS & Transport, Inc. had a duty under the False Claims Act, 31 U.S.C. § 3729(a)(1)(A), to refrain from knowingly presenting or causing to

be presented false claims for payment to the United States, including by making claims to Government healthcare programs. Likewise, Defendant Mobile Care EMS & Transport, Inc. had a duty under the False Claims Act, 31 U.S.C. § 3729(a)(1)(B), to refrain from making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim to the United States, including claims Government healthcare programs.

255. Defendant Mobile Care EMS & Transport, Inc. had a duty under the False Claims Act, 31 U.S.C. § 3730(h), to refrain from taking retaliatory actions against employees who take lawful actions in furtherance of a False Claims Act action or who make other efforts to stop violations of the False Claims Act.

256. Defendant Mobile Care EMS & Transport, Inc. had a duty under Ohio Revised Code 2921.13(A)(3), (A)(4), (A)(9), and (A)(11) to refrain from knowingly making false statements to obtain money from Government healthcare programs because:

    a.    The purpose of Defendant's false statements was to mislead a public official in performing the public official's official function;

    b.    Defendant's false statements were made to secure the payment of healthcare benefits administered by a governmental agency or paid out of a public treasury;

    c.    Defendant's false statements were made with the purpose to commit or facilitate the commission of a theft offense; and

    d.    Defendant's false statements were made on a form, record, or other writing that is required by law.

257. Defendant Mobile Care EMS & Transport, Inc. had a duty under Ohio Revised Code 4113.52(A)(3) to refrain from taking disciplinary or retaliatory actions

against employees who report potential violations of law likely to cause an imminent risk of physical harm to persons, which are a hazard to public health or safety, or which may be a felony.

258.   In retaliation for Relator White's efforts to report and stop Mobile Care's continued violation of federal regulations and the False Claims Act by bringing Defendants into compliance with prerequisite requirements for billing Government healthcare programs for ambulance services, Defendant Mobile Care EMS & Transport, Inc. retaliated against, demoted, and discharged Relator White.

259.   Defendant Mobile Care EMS & Transport, Inc.'s actions are in direct violation of the public policy of the State of Ohio under the principles enunciated in and manifested in federal and State law, including 31 U.S.C. § 3729, *et seq.*; 18 U.S.C. § 287; 31 U.S.C. § 3730(h); Ohio Revised Code 2921.13(A)(3), (A)(4), (A)(9), and (A)(11); and Ohio Revised Code 4113.52(A)(3).

260.   Defendant Mobile Care EMS & Transport, Inc.'s retaliation against, demotion, and discharge of Relator White in violation of these public policies jeopardizes such public policies.

261.   Defendant Mobile Care EMS & Transport, Inc.'s discharge of Relator White was motivated by Relator White's attempts to prevent violations of 31 U.S.C. § 3729, *et seq.* and Ohio Revised Code 2921.13 and constituted conduct protected by 31 U.S.C. § 3730(h) and Ohio Revised Code 4113.52(A)(3).

262.   Defendant Mobile Care EMS & Transport, Inc. lacked an overriding legitimate business justification for the dismissal.

263.   Defendant Mobile Care EMS & Transport, Inc.'s retaliatory actions have

60

caused Relator White damages. Therefore, Relator White is entitled to complete relief necessary to make her whole, including reinstatement with the same seniority status that she would have had but for the discrimination, full reinstatement of fringe benefits and seniority rights, front pay, back pay, interest on the back pay and lost benefits, attorneys fees, expenses, and costs.

264.    Defendant Mobile Care EMS & Transport, Inc.'s actions were done with malice, because this Defendant acted with ill will and acted with a conscious disregard for the rights and safety of both Relator White and its own patients in a manner that has a great probability of causing substantial harm.

265.    In addition, Defendant Mobile Care EMS & Transport, Inc., as principal or master knowingly authorized, participated in, or ratified actions or omissions of its agents and servants that demonstrates malice.

266.    Therefore, Relator White requests an award of punitive damages to discourage others from committing similar acts.

## PRAYER FOR RELIEF

**WHEREFORE**, Relators on behalf of themselves and the United States of America, pray as follows:

(a)    That this Court enter judgment against the Defendants jointly and severally in an amount equal to three times the amount of damages the United States Government has sustained because of Defendants' actions, plus a civil penalty of $5,500.00 to $11,000.00 (or in other amount as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 pursuant to 31 U.S.C. § 3729(a)(1)) for each action in violation of 31 U.S.C. § 3729(a), and the costs of this action, with interest, including the

costs to the United States Government for its expenses related to this action;

(b)     That Relators be awarded all reasonable expenses incurred, plus reasonable attorneys' fees and costs, in accord with 31 U.S.C. § 3730(d);

(c)     That, in the event that the United States Government does not proceed with any portion of the action, Relators be awarded between 25% and 30% of the proceeds of the action or of the settlement in accord with 31 U.S.C. § 3730(d)(2);

(d)     That, in the event the United States Government elects to intervene in and proceed with any portion of this action, Relators be awarded between 15% and 25% of the proceeds of the action or settlement of the intervened portion of the action in accord with 31 U.S.C. § 3730(d)(1);

(e)     That, pursuant to 31 U.S.C. § 3730(c)(5), Relators be awarded a share of any alternate remedy that the United States Government elects to pursue;

(f)     That permanent injunctive relief be granted to prevent any recurrence of the False Claims Act for which redress is sought in this Second Amended Complaint;

(g)     That the United States and the Relator be awarded prejudgment and post judgment interest; and

(h)     That the United States Government and the Relator receive all relief, both at law and in equity, to which they may be reasonably entitled.

**IN ADDITION**, Relator Brandee White, on behalf of herself, prays as follows:

(i)     That pursuant to 31 U.S.C. § 3730(h), Relator White be awarded all relief necessary to make her whole, including reinstatement with the same seniority status that she would have had but for the discrimination, front pay, two times the amount of back pay, interest on the back pay, and compensation for all special damages sustained,

including litigation costs and attorneys fees;

(j)     That pursuant to Ohio Revised Code 4113.52(E), Relator White be awarded all relief that the Court may determine appropriate, including reinstatement to the same position that she held at the time of the disciplinary or retaliatory action, the payment of back wages, full reinstatement of fringe benefits, and seniority rights, as well as reasonable attorneys fees, witness fees, and fees for experts who testify at trial;

(k)     That pursuant to her pendant Ohio public policy claim, Relator White be awarded complete relief and all resulting damages, including reinstatement with the same seniority status that she would have had but for the discrimination, full reinstatement of fringe benefits and seniority rights, front pay, back pay, interest on the back pay and lost benefits, punitive damages, attorney's fees, expenses, and costs;

(l)     That Relator White be awarded prejudgment and post judgment interest; and

(m)     That Relator White receives all relief, both at law and in equity, to which she is reasonably entitled.

Respectfully submitted,


/s/ Erin M. Campbell
James B. Helmer, Jr. (0002878)
Robert M. Rice (0061803)
Erin M. Campbell (0079083)
James A. Tate (0085319)
HELMER, MARTINS, RICE &
 POPHAM CO., L.P.A.
600 Vine Street, Suite 2704
Cincinnati, Ohio 45202
Telephone: (513) 421-2400
Facsimile: (513) 421-7902
Email: jhelmer@fcalawfirm.com
        rrice@fcalawfirm.com
        ecampbell@fcalawfirm.com
        jtate@fcalawfirm.com

### **Certificate of Service**

I hereby certify that on May 10, 2019, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to all CM/ECF registrants listed for this matter.

/s/ Erin M. Campbell