UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| United States of America *ex rel.* Brandee White, et al., | : : : | Civil Action No. 1:15cv555 |
| *Plaintiffs* | : : | Douglas R. Cole |
| v. | : : : | |
| Mobile Care EMS & Transport, Inc., et al., | : : : | |
| *Defendants.* | : : | |

### RELATORS' RESPONSE IN OPPOSITION TO DEFENDANT MODIVCARE'S MOTION TO AMEND TO CERTIFY FOR INTERLOCUTORY APPEAL

Defendant ModivCare Solutions, LLC's ("ModivCare") motion to certify this Court's Order, Doc. 86, denying its motion to dismiss for interlocutory appeal, Doc. 92, should be denied. At least since the False Claims Act was amended 12 years ago to resolve the very question presented by ModivCare, there has been no reasonable disagreement regarding whether taking Government money by fraud from a third-party spending it on the Government's behalf was actionable under the FCA. ModivCare's motion is an effort to manufacture debate over a straightforward issue.

The Court cut right to the heart of things in its Order, recognizing that the definition of "claim" includes requests for money from "a recipient of federal funds who is 'spen[ding] or us[ing] [the money] on the Government's behalf or to advance a Government program'"—like the claims in this case. Order, Doc. 86, #927 (quoting 31 U.S.C. § [3729](b)(2)) (alterations in original). "Material," on the other hand,

looks only to whether a statement "tends to influence the payment or receipt of money." *Id.* at #924 (citing 31 U.S.C. § 3729(b)(4)). "Claims" submitted to Government-funded capitated plans tend to influence the payment of (Government) money. There is no requirement that they cause the Government to pay *more* money. *See id.* at #926.

The Court got this straightforward issue right the first time. There is no reason to interrupt this case so the Court of Appeals can revisit it.

I. **ModivCare Advances an Interpretation of the False Claims Act that is Contrary to the Plain Language of the Act and has been Repeatedly Rejected by Congress and by the Courts**

ModivCare's argument that materiality requires the direct payment of more money by the Government is the same one the Seventh Circuit rejected as "presentment in materiality clothing." *United States ex rel. Garbe v. Kmart Corp.*, 824 F.3d 632, 639 (7th Cir. 2016). As the *Garbe* court recognized, the False Claims Act was amended in 2009 specifically to rebut arguments like ModivCare's that the Act only applies to claims that are presented directly to an officer or employee of the Government. *Id.* at 638-39. Notably, those same amendments also added the definitions of "claim" and "material" upon which this Court based its decision.

In 2008, the Supreme Court held in *Allison Engine Co. v. United States ex rel. Sanders*, 553 U.S. 662, 668 (2008)—a case that was argued by Relators' counsel here—that 31 U.S.C. § 3729(a)(1) "requires a defendant's direct presentment of the false claim to an officer or employee of the government." *Garbe*, 824 F.3d at 638. In *Allison Engine*, the false claims for payment were presented by a subcontractor to a prime contractor spending Government money. *Allison Engine*, 553 U.S. at 667.

2

Because those false claims sought Government money indirectly from the prime contractor spending it rather than from the Government itself, the Supreme Court held that they were not actionable under the FCA. *Id.* at 668–72.

This narrowing of the original intent of the False Claims Act alarmed Congress:

> As a result [of *Allison Engine*], even when a subcontractor in a large Government contract knowingly submits a false claim to general contractor and gets paid with Government funds, there can be no liability unless the subcontractor intended to defraud the Federal Government, not just their general contractor. This is contrary to Congress's original intent in passing the law and creates a new element in a FCA claim and a new defense for any subcontractor that are inconsistent with the purpose and language of the statute.

S. REP. 111-10, 10, 2009 U.S.C.C.A.N. 430, 438.

Within a year, Congress enacted "Clarifications to the False Claims Act to Reflect the Original Intent of the Law," Pub. L. No. 111-21, § 4, 123 Stat. 1617, 1621 (2009), in part to remove any suggestion that a claim needed to be "presented to an officer or employee" of the Government directly. *See Garbe*, 824 F.3d at 638. These Fraud Enforcement and Recovery Act (FERA) amendments to former Section 3729(a)(2), now Section 3729(a)(1)(B), were explicitly made retroactive to June 7, 2008—two-days before the Supreme Court's decision in *Allison Engine*. Pub. L. No. 111-21, § 4(f)(1), 123 Stat. at 1625.[1]

---

[1] For a detailed discussion of the 2009 FERA amendments to the False Claims Act, including the history of *Allison Engine* and the new definitions of "claim" and "material," see James B. Helmer, Jr., The False Claims Act: Whistleblower Litigation, Chapter 2, Section VII 81–100 (8th ed. 2021).

3

Congress was not only concerned with *Allison Engine* threatening to remove accountability for fraud against Government contractors spending Government money though. The FERA amendments were also intended to repudiate arguments like ModivCare's that there is no FCA remedy for fraud against entities spending Government money to advance Government interests simply because the false claims do not result in the Government paying more money. This concern arose because of *United States ex rel. DRC, Inc. v. Custer Battles, LLC*, 376 F. Supp. 2d 617, 646-47 (E.D. Va. 2005), *rev'd* 562 F.3d 295 (4th Cir. 2009), which held that U.S. Government funds provided to and administered by the Coalition Provisional Authority in Iraq were no longer in reach of the FCA.[2] Congress amended the False Claims Act to make clear that such claims were within its ambit:

> When the U.S. Government elects to invest its resources in administering funds belonging to another entity, or providing property to another entity, it does so because use of such investments for their designated purposes will further the interest of the United States. False claims made against Government-administered funds harm the ultimate goals and U.S. interests and reflect negatively on the United States. The FCA should extend to these administered funds to ensure that the bad acts of contractors do not harm the foreign policy goals or other objectives of the Government. Accordingly, this bill includes a clarification to the definition of the term "claim" in new Section 3729(b)(2)(A) and attaches FCA liability to knowingly false requests or demands for money and property from the U.S. Government, without regard to whether the United States holds title to the funds under its administration.

---

[2] S. Rep. No. 111-10, at 12 (2009) ("The Committee included provisions in the bill to address a recent decision involving funds administered by the U.S. Government during the reconstruction of Iraq. . . . The Committee believes this result is inconsistent with the spirit and intent of the FCA.") (discussing *Custer Battles*, 376 F. Supp. 2d 617).

4

S. Rep. No. 111-10, at 12–13 (footnotes omitted).

Notably, unlike "claim," the definition of "material" added in 2009 was not tied to money or property from the U.S. Government. Rather, Congress adopted the "natural tendency to influence, or be capable of influencing, the payment or receipt of money or property" understanding of materiality set forth in *Neder v. United States*, 527 U.S. 1, 16 (1999). *See Universal Health Servs. v. United States ex rel. Escobar*, 579 U.S. 176, 136 S. Ct. 1989, 2002 (2016) (citing *Neder*, 527 U.S. at 16). The *Escobar* court further reinforced the fact that the common law and the plain language of the FCA do not limit materiality to directly influencing *the Government* to pay more money by finding that "Under any understanding of the concept, materiality 'look[s] to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation.'" *Id.* at 2002 (quoting 26 R. Lord, Williston on Contracts §69:12, p. 549 (4th ed. 2003) (Williston)).

Capitated Government Healthcare Plans (GHPs) are the direct recipients of the claims—and the misrepresentations—at issue in ModivCare's motion. *See* Mtn. to Certify, Doc. 92, # 1026 (discussing MyCare Ohio). *Escobar* recognizes that materiality under the FCA is satisfied when a statement is capable of influencing *the recipient of the alleged misrepresentation* to pay money; so long as that recipient is spending Government money. *Id.* at 1996, 2002. The *Escobar* court did not silently engraft an amendment onto the FCA's definition of materiality (or *Escobar*'s own recitation of the common law understanding of that term) by writing that a misrepresentation "must be material to the Government's payment decision."

5

*See contra* Mtn. to Certify, Doc. 92, #1021 (quoting *Escobar*, 136 S. Ct. at 2002); *But see also* discussion of post-*Escobar* cases finding that fraud against capitated plans is actionable under the FCA, *infra* Part II.B.

Rather, this language is simply a reflection that the False Claims Act targets misrepresentations that could influence the payment of money that originally came from the Government. And there is no doubt that the issues raised in Relators' allegations are important enough that they could influence the payment of Government money. *See, e.g.*, Order, Doc. 86, #924 ("Of course, there is little question that the statements regarding medical necessity here led to the payment of funds").

This returns us to the Seventh Circuit's observation that arguments like ModivCare's that fraud against capitated, Government-funded health care plans is immaterial because "the government never actually received or paid any of its reimbursement requests" are "just presentment in materiality clothing." *Garbe*, 824 F.3d at 637, 639. ModivCare is trying to resurrect the pre-FERA False Claims Act, as interpreted by *Allison Engine*, under the guise of "materiality." But the Act does not require Relators to prove that false claims resulted in the payment of *more* Government money, or "trace the movement of currency from the U.S. Treasury through the . . . funding structure" of capitated GHPs. *Garbe*, 824 F.3d at 639.

ModivCare's argument that the Government has no recourse against individuals who defraud capitated plans like Medicare Advantage (Part C), Medicare Part D, and Medicaid Managed Care that spend hundreds of billions of

6

dollars on behalf of the Government annually to advance Government interests[3] "not only conflicts with plain statutory language and clearly expressed Congressional intent, but also makes little sense," as Senator Grassley put it. Brief of U.S. Senator Charles E. Grassley as Amicus Curiae in Support of Appellee at 9-10, *United States ex rel. Garbe v. Kmart Corp.*, 824 F.3d 632 (7th Cir. 2016) (No. 15-1502), ECF No. 28 ("Grassley Amicus").[4] "Congress had no reason to treat the Part D program [or any other capitated GHP] differently, and it did not. That result would be an absurd anomaly, immunizing such false claims that unequivocally are based at least in part on federal funds." *Id.* at 10.

Accepting ModivCare's position that an FCA claim can exist only where the defendant's fraud increases the amount paid by the government "would mean that any government program that involved a fixed annual contribution from the Government would be completely immune from claims of abuse." *United States ex. rel. Hunt v. Merck-Medco Managed Care, L.L.C.*, 336 F. Supp. 2d 430, 442 (E.D. Pa.

---

[3] *See, e.g.*, MedPac, *Health Care Spending and the Medicare Program, July 2021*, at 14 (noting that Medicare Advantage alone accounts for 34% of $787 billion Medicare spent on benefits in 2019), available at https://www.medpac.gov/wp-content/uploads/import_data/scrape_files/docs/default-source/data-book/july2021_medpac_databook_sec.pdf)

[4] Senator Grassley was one of the primary sponsors of the FERA amendments to the False Claims Act, as well as the 1986 amendments that created the modern Act. His *amicus* brief in *Garbe* also chronicles Congress' earlier efforts to address arguments like ModivCare's: "[The Seventh Circuit] held in *United States v. Azzarelli Construction Co.*, 647 F. 2d 757 (7th Cir. 1981), that the False Claims Act did not apply where the Government payments at issue were fixed. Congress explicitly overruled that decision when it amended the FCA in 1986." Grassley Amicus at 2.

2004). The *Hunt* court observed, correctly, that it "is simply inconceivable" that "Congress would have the FCA turn a blind eye to such behavior." *Id.* And of course Congress would not. As the text and history of the False Claims Act demonstrates, Congress explicitly sought to ensure that fraud against fixed Government funds remained under the watch of its most important fraud-fighting tool.

## II. ModivCare Has Not Satisfied the Requirements of 28 U.S.C. § 1292(b)

To prevail on its motion to certify for interlocutory appeal, ModivCare must demonstrate that the order appealed from: 1) "involves a controlling question of law"; 2) for which "there is a substantial ground for difference of opinion"; and 3) that allowing an immediate appeal of this court's ruling "may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). "Review under § 1292(b) is granted sparingly and only in exceptional cases." *W. Tenn. Chapter of Assoc. Builders & Contractors, Inc. v. City of Memphis, (In re City of Memphis)*, 293 F.3d 345, 350 (6th Cir. 2002) (internal citation omitted). Because ModivCare has failed to meet its burden to demonstrate the existence of all three prongs justifying an immediate, piecemeal appeal under § 1292(b), its motion to certify should be denied.

### A. The Materiality of Claims Against Capitated Government Health Care Programs is not Controlling in the way ModivCare Presents it to Be

Whether or not a defendant can take Government money by fraud from capitated healthcare programs like Medicaid Managed Care and Medicare Part C is certainly an important question in this case. But the inquiry is not limited in the way ModivCare presents it to be.

8

First, Relators' allegations against ModivCare are not limited to MyCare Ohio, despite ModivCare's repeated assertions to the contrary. ModivCare makes this assertion many times in its Motion to Certify, but only cites a basis for it once: "Relators agreed that their claims against ModivCare relate solely to MyCare Ohio . . . ." Mtn., Doc. 92, #1023 (citing Doc. 66, #608–09). ModivCare repeats this assertion many more times without citation. *See id.* at #1022, #1025, #1026.

Relators do discuss ModivCare's relationship with MyCare Ohio at Doc. 66, #609, but by no means suggest agreement that their claims are limited to this program. In fact, Relators allege that ModivCare brokers non-emergency transports for "Federally-funded Medicare Advantage and state Medicaid healthcare plans," Doc. 66 at #608; Relators note that ModivCare "contracts with MyCare Ohio plans, Medicare Advantage plans, and Medicaid managed-care plans," and that "the amount paid to [ModivCare] by managed-care plans still constitutes a 'claim' that is actionable under the False Claims Act," *id.* at #609; and, "Relators eventually determined that [ModivCare's] preapproval scheme and failure to ensure medical necessity was at least regional, if not nationwide, in scope." *Id* at #610 (citing SAC, Doc. 53, #468 ("[ModivCare's] scheme is nationwide in scope").

ModivCare's assertion that this case is limited to false claims it submitted to MyCare Ohio is simply wrong, and unsupported by its incomplete presentation of the record. (Nor are Relators' claims limited by the example claims identified in their complaint, as this Court recognized by deciding that resolution of the "capitated-payment point obviates the need to discuss the sufficiency of the

9

allegations relating to other government healthcare programs." Order, Doc. 86, #923.)[5]

This clarification of ModivCare's argument is important, but this is not the prong of § 1292(b) that should decide the matter.

### B. There is no Substantial Ground for Difference of Opinion Whether it is Possible to Defraud Capitated Government Healthcare Plans

ModivCare starts its "substantial ground for difference of opinion" argument on the wrong foot. It is simply mistaken that "Neither Relators nor the Court identified any case" finding materiality when an FCA defendant's fraudulent conduct "caused it to 'receiv[e] additional money to which [it was] not entitled from an entity that is funded at least in part by federal funds.'" Mtn. to Certify, Doc. 92, #1027. *Garbe*, relied on extensively by the Relators in their opposition brief, Doc. 66,

---

[5] "Where an alleged FCA scheme involves numerous transactions occurring over the course of several years, a plaintiff need not provide the details of every fraudulent transaction." *United States ex rel. Kalec v. NuWave Monitoring, LLC*, 84 F. Supp. 3d 793, 800 (N.D. Ill. 2015). Nor does the Relator need to provide data from every State or Government program to maintain those claims—he simply needs "some firsthand information to provide grounds to corroborate [his] suspicions." *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.,* 631 F.3d 436, 446 (7th Cir. 2011)) (observing that Walgreens' suggestion "that Pirelli necessarily needed Illinois data to establish the existence of a fraudulent scheme" in Illinois was "incorrect").

"In order for a relator to proceed to discovery on a fraudulent scheme, the claims that are pled with specificity must be 'characteristic example[s]' that are 'illustrative of [the] class' of all claims covered by the fraudulent scheme." *United States ex rel. SNAPP, Inc. v. Ford Motor Co.*, 532 F.3d 496, 506 (6th Cir. 2008) (quoting *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 510-11, 514-15 (6th Cir. 2007) (quotations omitted) ("affirming a claim of widespread Medicare and Medicaid fraud when the Relator identified a single, representative patient who was fraudulently diagnosed to induce payment from the government.")).

10

made this exact holding "Garbe is required to show only that Kmart's allegedly false claims were material to Kmart's receipt of more [Medicare Part D] money than it should have gotten." *Garbe*, 824 F.3d at 639. As discussed in Section I above, this is the inescapable result of faithful application of the definitions of "claim" and "material."

Nothing about *Escobar* changes this analysis. Post-FERA and post-*Escobar*, courts have not found that materiality is lacking simply because the Government pays a flat, capitated amount to an intermediary (rather than reimbursing on a variable fee-for-service basis). *See, e.g., United States ex rel. Martino-Fleming v. S. Bay Mental Health Ctr.*, Civil Action No. 15-13065-PBS, 2018 U.S. Dist. LEXIS 161523, at *21–22 (D. Mass. Sept. 21, 2018) ("*Martino-Fleming I*"); *see also Mass. ex rel. Martino-Fleming v. S. Bay Mental Health Ctr., Inc.*, 334 F. Supp. 3d 394, 408-09 (D. Mass. 2018) ("*Martino-Fleming II*") (rejecting argument that fraud against a Medicaid Managed Care entity cannot exist under the capitated payment system and instead concluding that state law FCA claim existed against health care provider because, even though managed care entity was paid a "fixed rate" per patient by the state Medicaid program, the provider's claims were "paid with government money." "The fact that Medicaid did not suffer damages because it paid a capitated rate does not negate liability because liability attaches to the 'claim for payment.'" *Martino-Fleming I*, 2018 U.S. Dist. LEXIS 161523, at *22 (internal citation omitted).

11

Capitated Government healthcare plans are still "subject to the False Claims Act" after *Escobar*. *See United States ex rel. Silingo v. Wellpoint, Inc.*, 904 F.3d 667, 673 (9th Cir. 2018) (discussing Medicare Advantage (Part C)). "Liability attaches upon proof that a false claim for payment was made, regardless of whether the government suffered actual damage." *Id.* at 674 (citing *United States ex rel. Aflatooni v. Kitsap Physicians Serv.*, 314 F.3d 995, 1002 (9th Cir. 2002)).

And ModivCare's argument that fraud against a capitated plan cannot cost the Government more money is plainly incorrect. ModivCare says that "the United States would have paid MyCare and Aetna precisely the same amount of money with or without the alleged misconduct." Mtn. to Certify, Doc. 92, #1028. But capitation rates change, and capitated Government healthcare plans have "risk adjustment" and reconciliation processes that either modify payments to the entities administering these plans in a given benefit year based on the actual expenditures that year, or increase capitated payments in subsequent years. As the CMS, *Financial Alignment Initiative, MyCare Ohio: First Evaluation Report* (Nov. 15, 2018), https://goo.gl/rHpAB3, "MyCare Evaluation Report," that ModivCare relied on in its Mtn. to Dismiss, Doc. 60, #571–72 notes, "Each component" of MyCare Ohio is "calculated using baseline spending trends," and "risk adjusted." MyCare Evaluation Report, at 63. If the baseline spending trends or risk adjustment are inflated by fraud, the capitation payments are too. Thus, fraud against capitated plans *does* cost the Government more money, it just occurs over time rather than the instant the claim is submitted.

12

Nevertheless, as Relators set out in their opposition to ModivCare's Motion to Dismiss, damages are not an element of False Claims Act liability. Doc. 66, #622–23, #626. Nor is the harm caused by fraud against fixed Government funds limited to the Government spending more money: "'Whether or not the United States Government would be out additional money beyond that already appropriated . . . it would suffer a loss if the money appropriated for legitimate purposes were instead wasted on a false claim.'" *Hunt*, 336 F. Supp. 2d at 443 (quoting *United States ex rel. Yesudian v. Howard University et al.*, 153 F.3d 731, 739 (D.C. Cir. 1998)).

The cases that ModivCare insists reach a contrary conclusion (which, incidentally, would also be contrary to the plain language of the FCA) are distinguishable and inapposite for the reasons already articulated in Relators' opposition to ModivCare's Motion to Dismiss, Doc. 66, #624–26, and in this Court's Order, Doc. 86, #926.

Though ModivCare is not the only False Claims Act defendant to try bootstrapping materiality to escape liability for submitting false "claims" to intermediaries spending Government money, there is no "substantial" difference of opinion among the courts. The law and the cases interpreting it are clear: persons who take Government money by fraud from third parties spending it on the Government's behalf are subject to the False Claims Act.

    **C.    An Immediate Appeal Will Delay the Litigation's Ultimate Termination**

The Sixth Circuit would likely decide the question presented by ModivCare for interlocutory appeal—whether the Government can use the False Claims Act to

13

combat fraud against the health care programs it funds—in the same way its sister circuits and district courts have done: the Government can. This is what Congress intended and the text of the FCA requires. Certifying the Court's Order, Doc. 86, for interlocutory appeal would only increase the cost and burden of this case, and delay its ultimate termination.

### III. Conclusion

The False Claims Act broadly protects the funds and property of the Government from false or fraudulent claims.[6] "Enacted in 1863 to fight rampant fraud in Civil War procurement contracts, the [Act] remains the government's 'primary litigative tool for combatting fraud.'" *United States ex rel. Doe v. Staples, Inc.*, 773 F.3d 83, 84 (D.C. Cir. 2014) (quoting S. Rep. No. 99-345, at 2, 4 (1986)). Congress has acted repeatedly to strengthen this critical tool against attacks just like the one ModivCare levels against the Act here.

Adopting ModivCare's position that it is immaterial if you take the Government's money from a third party by fraud would thwart the express intent of Congress, undo years of False Claims Act jurisprudence, and defy common sense. There is vanishingly little support for this radical position—and certainly not a "substantial difference of opinion" on the matter.

This Court got it right the first time, as many Courts have done before it. ModivCare's Motion to Amend to Certify for Interlocutory Appeal should be denied.

---

[6] *United States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968); *Rainwater v. United States*, 356 U.S. 590, 592 (1958).

14

>
> Respectfully submitted,
>
> *s/ James A. Tate*
> James B. Helmer, Jr. (0002878)
> James A. Tate (0085319)
> B. Nathaniel Garrett (0090939)
> Helmer, Martins, Tate &
>  Garrett Co., LPA
> 600 Vine Street, Suite 2704
> Cincinnati, Ohio 45202
> Telephone: (513) 421-2400
> Facsimile: (513) 421-7902
> Email: jhelmer@fcalawfirm.com
>         jtate@fcalawfirm.com
>         ngarrett@fcalawfirm.com
>
> *Attorneys for Relators*

## CERTIFICATE OF SERVICE

    I hereby certify that on December 1, 2021, a copy of the foregoing was filed electronically with the Clerk of this Court using the CM/ECF system, which will serve this filing on all counsel of record in this action.

                                            *s/ James A. Tate*
                                            Attorney for Relators