**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

**UNITED STATES OF AMERICA ex**
**rel. BRANDEE WHITE, et al.,**

              **Plaintiffs,**            **Case No. 1:15-cv-555**
                                       **JUDGE DOUGLAS R. COLE**

     **v.**

**MOBILE CARE EMS & TRANSPORT,**
**INC., et al.,**

              **Defendants.**

**AMENDED[1] OPINION AND ORDER**

This is a qui tam action with a long and somewhat muddled procedural history (as is often the case with such actions). Relators initially sued four entities—Mobile Care Group, Inc.; Mobile Care Group of Ohio, LLC; Mobile Care EMS & Transport, Inc.; and LogistiCare Solutions, Inc.—on behalf of the United States under the False Claims Act ("FCA"). (Compl., Doc. 1). Shortly thereafter, Relators amended their complaint to add three individual claims against Mobile Care EMS & Transport, Inc. on behalf of Relator Brandee White: one claim for FCA retaliation and two pendent state law claims generally sounding in wrongful termination. (Am. Compl., Doc. 6). About three years later, the government partially intervened (only against Mobile

---

[1] The Court originally issued this Opinion and Order on October 18, 2021. (Doc. 86). Since that time, LogistiCare Solutions (now known as ModivCare) has moved the Court to certify the Order under 28 U.S.C. § 1292(b). (*See* Doc. 92). As discussed further below, after briefing on the issue, the Court concurs that such certification is appropriate. Accordingly, the Court issues this Amended Opinion and Order to include that certification. Changes relating to considering and implementing that certification are the only changes from the previous version of this Opinion and Order. (*See* Doc. 86).

Care EMS & Transport, Inc. ("Mobile Care"), and not against LogistiCare Solutions, Inc. ("LogistiCare")),[2] and the Court (the matter was assigned to a different judge at the time) unsealed the amended complaint. (*See* Doc. 26). A few months later, the government filed its own complaint. (Gov't Compl., Doc. 48). Shortly thereafter, Relators filed a Second Amended Complaint ("SAC") asserting claims against only two of the original defendants—Mobile Care and LogistiCare—and adding more allegations regarding Relator White's individual claims. (*See* Doc. 53). Mobile Care Group, Inc. and Mobile Care Group of Ohio, LLC are thus no longer parties to this action.

The action is now before the Court on a host of motions to dismiss and related briefing. Specifically, Mobile Care seeks dismissal of Relators' first amended complaint (*see* Doc. 52), second amended complaint (*see* Doc. 58), and the government's complaint-in-intervention (*see* Doc. 51), or in the alternative a transfer of venue to the Northern District of Ohio.[3] LogistiCare likewise seeks dismissal of Relators' first amended complaint (*see* Doc. 50), and second amended complaint (*see* Docs. 59 and 60 (the latter amending the former)), but does not seek dismissal of the United States' complaint-in-intervention, as that complaint directs no claims at LogistiCare.

---

[2] The government's notice of intervention (Doc. 23) actually states that the government is intervening as against "Mobile Care Group, Inc.," but the government's complaint-in-intervention (Doc. 48) is against Mobile Care EMS & Transport, Inc.

[3] In addition to moving to dismiss Relators' second amended complaint, Mobile Care also moved to strike it. (*See* Doc. 57). Shortly thereafter, though, Mobile Care withdrew that motion. (*See* Doc. 63).

For the reasons more fully set forth below, the Court **DENIES** each of the motions to dismiss and the request to transfer venue.

## FACTUAL BACKGROUND

Because this case is before the Court on various motions to dismiss, the Court takes its factual recitation from the allegations in the Relators' second amended complaint (their operative complaint) and the government's complaint (which largely mirror the allegations in the second amended complaint, at least as to Mobile Care's alleged role in violating the FCA). In discussing the substance of these allegations, however, the Court expressly notes that they are merely *allegations*, which have not yet been, and may never be, proven.

**A.    The Defendants Are Medical Transport Services Providers.**

Mobile Care is an ambulance transportation supplier. It transports patients to hospitals or other healthcare facilities. LogistiCare is a non-emergency medical transportation broker. Both entities participate in government-run healthcare programs, including Ohio's Medicaid and MyCare Ohio programs (both of which are funded in part by federal dollars) and the federal government's Medicare and Medicare Advantage programs.

These healthcare programs provide certain coverage for medical transport services, but only to the extent that those services are medically necessary. (SAC, Doc. 53, #426; Gov't Compl., Doc. 48, #323). The medical necessity test applies not only to the transport service generally, but also the level at which such services are provided. That is, transport providers may offer a variety of service types, for

3

example, both non-emergency and emergency transport services. Moreover, even within those broad categories, a given program may specify further distinctions. Medicare, for example, specifies seven different categories for transport services. (SAC, Doc. 53, #448–49). Under the government healthcare programs at issue here, reimbursements for transport vary depending on the level of transport services (as defined in each program) that the supplier provides. And the supplier must also certify that the level of service it provided—whichever level that may be—was medically necessary pursuant to the regulations at issue.

Again, though, even the lowest level of transport services must be medically necessary in order to qualify for reimbursement. For example, non-emergency ambulance transport is considered medically necessary only if the "beneficiary is bed-confined, and it is documented that the beneficiary's condition is such that other methods of transport are contraindicated; or, if his or her medical condition, regardless of bed confinement, is such that transportation by ambulance is medically required." (*Id.* at #444 (quoting 42 C.F.R. § 410.40(d)(1)).

Beyond the medical necessity requirement, the programs may also have other prerequisites for coverage of transport services. Medicare Part B, for example, provides a good starting point, as "Relator's allegations in [the] Second Amended Complaint primarily involve the Defendants' false and fraudulent claims made under Medicare Part B for ambulance transports." (*Id.* at #434; Gov't Compl, Doc. 48, #324 ("the majority of the claims, and those at issues [sic] in this Complaint, were submitted to Medicare Part B")). Medicare Part B (and thus also Medicare

Advantage) provide reimbursement only if (1) the patient is transported to an "appropriate destination," (2) applicable staffing, billing, and reporting requirements are met, and (3) the transportation is not part of a "Part A service." (SAC, Doc. 53, #442). As to the first of those, the only appropriate destinations are a hospital, critical access hospital, skilled nursing facility, the patient's home, or a dialysis facility for end-stage renal disease patients. (*Id*. at #452; Gov't Compl., Doc. 48, #327)). Medicare also generally conditions reimbursement on the supplier obtaining a signature from the patient who is transported (unless that person has died). (*Id*. at #446).

Medicaid programs likewise have requirements that transport suppliers must meet to qualify for reimbursement. Importantly, as with Medicare, Medicaid "only covers medically necessary services." (SAC, Doc. 53, #453 (citing Ohio Admin. Code § 5160-15-03(A)(2)(a)).

## B. The Relators Are Mobile Care Employees Who Say That They Were Instructed In Various Manners To Overbill For Transport Services.

Relator White was a Mobile Care employee. (*Id*. at #431). The company hired her to oversee Mobile Care's billing practices. (*Id*.). She claims that, beginning in December of 2009 and continuing at least through the date of the second amended complaint, Mobile Care had "knowingly … caused the submission of false or fraudulent claims to Government healthcare programs, and made or caused to be made false records and statements to get claims for ambulance services to Government healthcare programs paid." (*Id*. at #455). In particular, she alleges that Mobile Care was "pressuring its employees" to "upcode[]" medical transport services to higher billing levels. (*Id*. #456).

5

The other two relators are likewise Mobile Care employees, one a biller and one a licensed EMT. (*Id*. at #432). The former claims she "refus[ed] to bill for services that were not supported by … records." (*Id*.). The latter claims that he was instructed "to add specific statements and words to [his] Patient Care Reports in order to create the impression that the patients had a medically necessary reason requiring them to be transported" even if that was not the case. (*Id*. at #460). The Complaint also provides examples of meetings and other interactions in which Mobile Care allegedly applied pressure to EMTs and billers to assist in the fraudulent billing scheme. (*Id*. at #456–64).

## C. **The Relators Claim That LogistiCare Also Participated In The Overbilling.**

As noted above, LogistiCare does not directly provide medical transport services. Rather, it is a broker for such services. The Relators claim that "[w]hen nursing facilities, skilled nursing facilities, or others request ambulance transport for beneficiaries of Government healthcare programs, they contact LogistiCare and LogistiCare schedules such transportation by arranging an ambulance provider or supplier, like Mobile Care, to provide such transportation." (*Id*. at #465).

Relators allege that "LogistiCare routinely schedules" such transport "by ambulance on a nonemergency basis where no medical necessity exists for ambulance transportation." (*Id*.). Relator White further alleges that she tried to inform LogistiCare when she learned that no medical necessity existed in a given case, but that LogistiCare departments "routinely do not answer their phones or return calls." (*Id*. at #466). On those occasions where she has spoken to LogistiCare employees,

they have told her that the ambulance services are preapproved by Aetna (which administers Ohio's MyCare Ohio program), but in her experience Aetna does not typically review patient files to make such determinations. (*Id.*). Thus, she says, by relying on that preapproval, "LogistiCare has a practice and policy of directing ambulance transport companies to bill Government healthcare programs for ambulance transportation even when medical necessity is not present." (*Id.* at 467).

## D.      Relators Point To Specific Examples Of Alleged Fraud.

Buttressing the allegations, Relators point to five examples of alleged fraudulent billing. All five examples involve patients who Mobile Care transported. According to Relators, as to each of the five, Mobile Care overbilled. And as to two of the five, LogistiCare was aware of the overcharges, but nonetheless participated in scheduling further transport for those patients through Mobile Care, knowing that such overbilling was occurring. (*Id.* at #469–78). As to each of the five, Relators describe the date on which the transport occurred, and provide sufficient details about the transport that the defendants should be able to identify the transport at issue. For example, Relators identify emails that employees exchanged in connection with the transport, as well as the services provided, the billed amount, and, in some cases, the dates of claim submission and payment. (*Id.*).

## E.      The Government's Complaint In Partial Intervention Is Limited To Mobile Care.

For its part, the government's complaint-in-intervention is nearly identical to the Relators' second amended complaint in terms of describing the conduct that allegedly violated the FCA, but there are some notable exceptions. Let's start with

the latter. Perhaps most importantly, the government's complaint is limited to Mobile Care. It makes no FCA allegations (or any other allegations for that matter) against LogistiCare. Nor does the government's complaint, not surprisingly, include Relator White's personal claims, whether for FCA retaliation or wrongful discharge.

Beyond that, though, the story is basically the same. The government alleges that Mobile Care overbilled Medicare and Medicaid for ambulance transport services. (*See* Gov't Compl., Doc. 48, #332). In support of that, the government points to the same examples of alleged pressure that Relators say Mobile Care applied to billing personnel and EMTs. (*See id.* at #332–39). It also points to the same examples of how that pressure was applied (various meetings and email communications). (*See id.*). And the government relies on the same five specific examples of alleged overbilling as set forth in the Relators' second amended complaint. (*See id.* at #339–46). As to these issues, the substance of the allegations is nearly word-for-word identical to the account that Relators put forward.

Based on those allegations, the government presses four counts. The first two are the same FCA claims that the Relators had alleged in their amended complaint. (*Id.* at #346). The third is a common law claim for unjust enrichment. (*Id.* at #347). Last, the government asserts another common law claim for payment by mistake. (*Id.* at 347–48).

Of course, as to the Mobile Care overbilling claims, the government's complaint, not the Relators' second amended complaint, is the operative complaint. Thus, these are the four overcharge-based counts currently pending against Mobile

8

Care, supported by the allegations set forth in the government's complaint. As to the FCA claims against LogistiCare (to the extent such claims are permissible, an issue to which the Court returns below) and Relator White's individual claims against Mobile Care, though, the second amended complaint is the operative complaint.

## THE PENDING MOTIONS

The various complaints have led to a flurry of motions to dismiss. As noted above, this includes motions from both defendants to dismiss both Relators' first and second amended complaints. Defendant Mobile Care has further moved to dismiss the government's complaint-in-intervention. The Court need not discuss all five of the motions, though, as the filing of the second amended complaint mooted the motions directed at the first amended complaint. Moreover, even were that not the case, each defendant's motion to dismiss the Relators' second amended complaint is virtually identical to that defendant's motion to dismiss the first amended complaint. So the Court will discuss only (a) Mobile Care's motion to dismiss the government's complaint-in-intervention, (b) Mobile Care's motion to dismiss the Relators' second amended complaint, and (c) LogistiCare's Motion to dismiss the Relators' second amended complaint.

## A. Mobile Care's Motion To Dismiss The Government's Complaint-in-Intervention.

In its motion seeking to dismiss the government's claims, Mobile Care presses three basic arguments.

First, Mobile Care argues that the FCA claims fail because the government has failed to sufficiently allege that Mobile Care either knew the claims were false or

acted with deliberate ignorance or reckless disregard. (MC Mot. to Dismiss Gov't Compl., Doc. 51, #389–98). Mobile Care says that the allegations, at most, show negligence, which is not enough to support an FCA claim. (*Id*.). In support of this, it offers innocent explanations of the various communications and meetings cited in the government's complaint. It further goes through each of the five proffered examples of patient transports and attempts to show that the billings for those patients do not reflect fraud. (*Id*. at #396–98).

Second, Mobile Care attacks the claims for unjust enrichment and payment by mistake on similar grounds. Essentially, Mobile Care claims that the government has failed to provide sufficient allegations to plausibly show that Mobile Care submitted claims for payments that were not medically necessary. (*Id*. at #398–400).

Finally, Mobile Care claims that venue is not appropriate in the Southern District of Ohio. (*Id*. at #400–02). According to Mobile Care, the government has not alleged that Mobile Care or LogistiCare reside in this district, or that they committed an FCA violation here. (*Id*. at #400). Of course, the government is not intervening against LogistiCare, so it is not surprising that the government did not specify where LogistiCare's alleged conduct occurred. But as it appears that at least some of LogistiCare's conduct did occur in this district, Mobile Care also explains why the Court cannot rely on LogistiCare's conduct in support of the venue issue. According to Mobile Care, the government's partial intervention in this action precludes the case from going forward against LogistiCare, against whom the government chose

not to intervene. (*Id.* at #401). (The Court expands on this argument in discussing LogistiCare's motion to dismiss below.)

## B. Mobile Care's Motion To Dismiss The Relators' Second Amended Complaint.

Mobile Care's other motion to dismiss is directed at Relator White's claims against the company. (*See* MC Mot. to Dismiss SAC, Doc. 58). In terms of the FCA retaliation claim, Mobile Care contends that: (i) she failed to adequately allege that she was engaged in FCA-protected activity; (ii) that in any event, she fails to adequately allege that Mobile Care was on notice of any such activity; and (iii) that, without such notice, Mobile Care thus could not have fired her in retaliation for engaging in FCA-protected conduct. Mobile Care says each of these is necessary to support an FCA retaliation claim. (*Id.* at #509–13).

As for the state law retaliation claim, Mobile Care says that, as alleged here, it is basically a mirror of the FCA retaliation claim, and thus it is fatally flawed for the same reasons identified above. (*Id.* at #514). And the state-law claim for discharge in violation of public policy, Mobile Care says, suffers from that same basic flaw. (*Id.* at #514–15).

Separately, Mobile Care also attacks venue in this Court. Its argument in that regard is identical to the argument it pressed on the venue matter in its motion to dismiss the government's complaint. (*Id.* at #515–17). Accordingly, the Court will not repeat that argument here.

11

**C. LogistiCare's Motion To Dismiss The Relators' Second Amended Complaint.**

Finally, LogistiCare moves to dismiss Relators' second amended complaint on two grounds. (*See* LC Am. Mot. to Dismiss SAC, Doc. 60). First, LogistiCare argues that the government's decision not to intervene in the FCA claims against LogistiCare forecloses Relators from proceeding against LogistiCare on those claims, as well. Second, LogistiCare argues that Relators have failed to adequately allege any misrepresentation that was material to any government payment decision.

LogistiCare summarizes its first argument this way: a "False Claims Act [] relator may not pursue claims in the Government's name that the Government has decided not to pursue." (*Id.* at #555). In other words, according to LogistiCare, if a relator brings an FCA suit on the government's behalf against multiple defendants, and the government elects to intervene as to some, but not all, of those parties, then the FCA suit may not continue as to the remaining parties.

LogistiCare bases this argument largely on *United States ex rel. Brooks v. Stevens-Henager Coll., Inc.*, 359 F. Supp. 3d 1088, 1116–17 (D. Utah 2019). (*See* LC Am. Mot. to Dismiss SAC, Doc. 60, #561–69). There, as LogistiCare explains it, the government intervened in part. In particular, the government intervened as to some, but not all, of the claims against two, but not all, of the then-named defendants. Thereafter, the relator sought to add new claims and new defendants. The court, based on its reading of the FCA's text, concluded that an FCA suit cannot have "two masters," and dismissed the relator's amended complaint. LogistiCare argues that Brooks likewise compels dismissal of Relators' second amended complaint here.

Separately, LogistiCare argues that none of its alleged misrepresentations could have been material to a government payment decision. (*Id*. at #569–74). To get there, LogistiCare makes a two-step argument. First, LogistiCare says that the second amended complaint fails to sufficiently allege that LogistiCare is involved in billing any government healthcare plan other than MyCare Ohio, which is managed by Aetna. Thus, according to LogistiCare, only the terms of that program are relevant to the claims against LogistiCare. (*Id*. at #569–71).

LogistiCare then asks the Court to take judicial notice of the payment structure under that program. In particular, according to LogistiCare, publicly available materials show that Aetna receives a capitated rate from the federal government for plan participants in MyCare Ohio. That means that, independent of how may transports LogistiCare arranges, the amount of federal money Aetna receives will not change. Therefore, according to LogistiCare, the alleged conduct as a matter of law is not "material" to any government payment decision, and thus cannot support an FCA claim. (*Id*. at #572–74).

## LEGAL STANDARD

At the motion to dismiss stage, a complaint must "state[] a claim for relief that is plausible, when measured against the elements" of a claim. *Darby v. Childvine, Inc.*, 964 F.3d 440, 444 (6th Cir. 2020) (citing *Binno v. Am. Bar Ass'n*, 826 F.3d 338, 345–46 (6th Cir. 2016)). "To survive a motion to dismiss, in other words, Plaintiffs must make sufficient factual allegations that, taken as true, raise the likelihood of a legal claim that is more than possible, but indeed plausible." *Id*. (citations omitted).

In making that determination, the Court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) (internal quotation omitted). That is so, however, only as to factual allegations. The Court need not accept as true any legal conclusions alleged in a complaint. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Moreover, the well-pled facts must be sufficient to "raise a right to relief above the speculative level," such that the asserted claim is "plausible on its face." *Iqbal*, 556, U.S. at 678; *Twombly*, 550 U.S. at 546–47. Under the *Iqbal/Twombly* plausibility standard, courts play an important gatekeeper role, ensuring that claims meet a threshold level of factual plausibility before defendants are subjected to the potential rigors (and costs) of the discovery process. Discovery, after all, is not meant to allow plaintiffs to discover whether a claim in fact exists, but rather to provide a process for gathering evidence to substantiate an already plausibly-stated claim.

## LAW AND ANALYSIS

### A. The False Claims Act Penalizes The Submission Of Fraudulent Claims For Payment To The United States Government.

As noted above, this is a qui tam action asserting a False Claims Act ("FCA") claim against two defendants. As at least some of the defendants' arguments here involve the intricacies of the FCA, a statutory primer serves as a good starting point.

Congress originally enacted the FCA in 1863, and the Act was "aimed principally at stopping the massive frauds perpetrated by large contractors during

the Civil War." *Universal Health Servs., Inc. v. United States*, 136 S. Ct. 1989, 1996 (2016) (quoting *United States v. Bornstein*, 423 U.S. 303, 309 (1976)). Consistent with that goal, the False Claims Act provides for an award of treble damages and civil penalties against any party who knowingly causes the submission of false or fraudulent claims for payment to the United States Government. 31 U.S.C. § 3729(a)(1). Under the terms of the statute, liability extends both to those who present such claims and those who cause such claims to be presented. Specifically, the FCA provides that:

> [A]ny person who—
>
> > (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
> >
> > (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or]
> >
> > (C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G)[]
>
> …
>
> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104–410 [1]), plus 3 times the amount of damages which the Government sustains because of the act of that person.

*Id*.

As the language reflects, the conduct must be "knowing" to give rise to liability. Helpfully, the FCA also defines that term:

> [T]he terms "knowing" and "knowingly"—
>
> > (A) mean that a person, with respect to information—
> >
> > > (i) has actual knowledge of the information;

       (ii)   acts in deliberate ignorance of the truth or falsity of the information; or

      (iii)  acts in reckless disregard of the truth or falsity of the information; and

   (B)  require no proof of specific intent to defraud[.]

*Id*. at § 3729(b)(1).

Separately, if liability is predicated on making a false "record or statement" in support of a false claim, the statement must be material. *Id*. at § 3729(a)(1)(B). The definition for that term again comes straight from the FCA:

> [T]he term "material" means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property.

*Id*. at § 3729(b)(4).

The FCA further provides that a person—referred to as the "relator"—"may bring a civil action for a violation of [the FCA] for the person and for the United States Government." 31 U.S.C. § 3730. In order to protect such relators, who may often be employees with knowledge of the wrongdoing, the FCA also includes an anti-retaliation provision. *See id*. at § 3730(h). One of Relator White's individual claims in this action arises under this provision.

As originally enacted, once a relator filed a qui tam action under the FCA, the relator controlled that action through its completion. Over the years, though, Congress provided, and most recently in 1986 refined, a role for the government in such actions. *See* False Claims Amendments Act of 1986, Pub. L. No. 99–562, sec. 3, § 3730, 100 Stat. 3153, 3154–55. Under the current FCA, a relator is required to file his or her action in camera and under seal. Once that occurs, the relator must provide

the government a "copy of the complaint and written disclosure of substantially all material evidence and information the person possesses." *Id*. at § 3730(b)(2). The FCA requires that complaint to "remain under seal for at least 60 days," and "not be served on the defendant until the court orders." *Id*.

The sixty-day period is designed to provide the government time to consider the information that the relator has provided and decide whether to intervene in the action. *See id*. at § 3730(b)(4). As a practical matter, the government often requests several extensions of that time, which the statute allows. *Id*. at § 3730(b)(3). Here, for example, nearly three years passed before the government filed notice of its intent to intervene.

Importantly for one of the arguments at issue here, if the government elects to intervene, "the action shall be conducted by the Government." *Id*. at § 3730(b)(4). The FCA expands on that in this fashion:

> If the Government proceeds with the action, it shall have the primary responsibility for prosecuting the action, and shall not be bound by an act of the person bringing the action. Such person shall have the right to continue as a party to the action, subject to the limitations set forth in paragraph (2).

*Id*. at § 3730(c)(1). The "limitations" to which this section refers include that the government may dismiss or settle the action without the relator's consent, but only after the Court has afforded the relator an opportunity to be heard if he or she objects to that course of action. *Id*. at § 3730(c)(2). Similarly, if the relator's "unrestricted participation" is interfering with the government's handling of the matter, or is resulting in harassment to the defendant, the court can limit the relator's participation in various ways, as well. *Id*. at § 3730(c)(2)(C).

Finally, if the FCA action succeeds, the relator is entitled to payment in the form of a percentage of the recovery from the defendant. The exact percentage depends on whether the government intervenes, and also the extent to which the relator contributed to the prosecution of the action, but the award can range up to 30% of the proceeds. *See* 31 U.S.C. § 3730(d). The relator is also entitled to recovery of any reasonable expenses that were necessarily incurred, plus reasonable attorneys' fees and costs. *Id*. Moreover, if the relator succeeds on his or her FCA retaliation claim, the relator is entitled to reinstatement, two times his or her back pay (along with interest on that amount), compensation for any "special damages," and litigation costs and attorneys' fees. *Id*. at § 3730(h)(2).

With that description of the FCA in mind, the Court addresses the various outstanding motions in this FCA action.

**B.    LogistiCare's Two Challenges To The Relators' Second Amended Complaint Both Fail.**

While the Court described LogistiCare's motion last in the Court's discussion above of the pending motions, the Court starts its analysis with that motion. That is because parts of Mobile Care's arguments (in particular, the venue issues) turn on Mobile Care's claim that LogistiCare is correct in arguing that the Relators' second amended complaint does not state a viable claim against LogistiCare. Thus, the resolution of Mobile Care's motions turns, in part, on the Court's resolution of LogistiCare's motion.

As noted above, LogistiCare advances two arguments in support of its request for dismissal: (1) that, given the government's decision to intervene against Mobile

Care, but not LogistiCare, the Relators cannot continue their FCA claims against the latter either; and (2) that, in any event, the Relators have failed to adequately allege that LogistiCare made a *material* misstatement. As discussed below, the Court rejects both of these arguments.

### 1. The Government's Decision To Intervene Against Only Mobile Care Does Not Preclude Relators From Pursuing The Non-Intervened Claims Against LogistiCare.

It has long been understood that the government can choose to intervene as to fewer than all of the claims set forth in an FCA case. For just two of the many recent examples, see, e.g., *United States ex rel. A. Duane Seabury, v. Cookeville Regional Medical Ctr. Auth.*, No. 2:15-CV-00065, 2021 WL 4594784, at *1 (M.D. Tenn. Oct. 6, 2021); *United States ex rel. Alt v. Anesthesia Servs. Assocs., PLLC*, No. 3:16-CV-0549, 2021 WL 3115157, at *1 (M.D. Tenn. July 22, 2021). Indeed, the FCA specifically provides that, if the government elects to intervene, it has the right to amend the complaint "to clarify or add detail to *the claims* in which the Government is intervening." 31 U.S.C. § 3731(c) (emphasis added). That certainly sounds like it creates the possibility for partial intervention, i.e., intervention as to certain "claims." In fact, so far as the Court can tell, LogistiCare does not dispute that basic proposition. All parties likewise acknowledge that when the government intervenes in a qui tam lawsuit, it takes over primary responsibility for "the action" and can settle claims or dismiss defendants.

The question, though, is what happens to any claims as to which the government elects *not* to intervene. According to LogistiCare, the acknowledged

option for the government to partially intervene, coupled with the settled proposition that when the government intervenes it takes responsibility for "the action," means that the government's decision not to intervene as to certain claims essentially results in a tacit dismissal of those claims. And LogistiCare relies on that proposition to seek dismissal of the FCA claims against it, based on the government's decision not to intervene as to those claims.

The crux of LogistiCare's argument is the statutory reference in the FCA to "the action." According to LogistiCare, the government's option when presented with a sealed FCA complaint is either to "proceed with the action," or to "decline[] to take over the action." 31 U.S.C. 3730(b)(4). And "the action," LogistiCare insists, necessarily refers to the entire lawsuit. In support of this position, LogistiCare points to (1) the Federal Rules of Civil Procedure, which provide that "there is one form of action—the civil action," Fed. R. Civ. P. 2, (2) the FCA, which allows the relator to bring (and the government to intervene in) "a civil action," 31 U.S.C. 3730(b)(1), and (3) the Utah district court decision in *Brooks*.

The Court is not convinced. Other courts have not been either. Indeed, as Relators point out, decisions both before and after *Brooks* have concluded that the reference to "the action" does not foreclose the possibility of the relator proceeding with non-intervened claims. *See, e.g., United States v. Berkeley Heartlab, Inc.*, 225 F. Supp. 3d 487, 505 (D.S.C. 2016) (noting that "[t]he Government partially intervened regarding the waiver of insurance copays and deductibles," but that "[b]ecause the Government elected not to intervene with regard to [the relator's] allegations

20

involving the payment of speaker's fees or the waiver of private insurance copays and deductibles, [the relator] has 'the right to conduct the action'" as to those claims) (quoting 31 U.S.C. § 3730(c)(3)). Indeed, those courts that have expressly considered *Brooks* have rejected it. (*See* Relators' Not. of Supp. Auth., Doc. 82 (citing *United States ex rel. Rauch v. Oaktree Med. Ctr., P.C.*, No. 6:15-cv-1589, 2020 WL 1065955 *9 (D.S.C. March 5, 2020) ("After examining the FCA statute as a whole, the Court is persuaded that 'action' means 'cause of action' and not 'civil action.' Therefore, the Court declines to adopt the reasoning of the *Brooks* court, which is an outlier in a large body of FCA case law."); *United States ex rel. Ormsby v. Sutter Health*, 444 F. Supp. 3d 1010, 1077 (N.D. Cal. 2020) ("Given the clear weight of authority that allows a relator to pursue non-intervened claims, the court follows that approach (and not *Brooks*) as persuasive."); *United States ex rel. Fischer v. Cmty. Health Network*, 2020 U.S. Dist. Lexis 221082 *13 (S.D. Ind. Nov. 25, 2020) (noting that "[t]he Court disagrees" with *Brooks*)).

Of course, the mere fact that other courts have rejected *Brooks*'s holding, in and of itself, is not enough to make that holding incorrect. *Brooks*, like LogistiCare here, basically argues that under a plain language reading, "action" means the entire case. But the problem is that, in arriving at that result, *Brooks* appears to over-parse the statutory language, without considering the broader statutory context.

That approach can lead one astray when it comes to the FCA. As now-Justice, then-judge, Alito once observed, "the draftsmanship of the qui tam statute has its quirks … and one of those quirks is that the statute is based on the model of a single-

claim complaint." *United States ex rel. Merena v. SmithKline Beecham Corp.*, 205 F.3d 97, 101 (3d Cir. 2000), as amended (Apr. 21, 2000). In other words, that statute is written as though every FCA claim consisted of a single claim against a single defendant. For example, 31 U.S.C. § 3730(b), in describing the "civil action" that a "person" may bring, repeatedly refers to "the defendant." Of course, if the sole claim pursued in this action were for a single violation of the FCA by a single defendant, LogistiCare's desired outcome would follow as a matter of course. Where there is only one claim and one defendant, either the government or the private party is pursuing that claim, not both.

But when there are multiple claims and multiple parties, things get trickier. The government's right, after all, is either to "proceed with the action" or "decline to take over the action." 31 U.S.C. § 3730(b)(4). Thus, under LogistiCare's proposed single-action rule, partial intervention presumably should not be allowed at all. If the government wanted to partially intervene (i.e., intervene as to only some claims or some defendants), the only way to achieve that result would be for the government to take over the entire action, and then move to dismiss the claims (and parties) that it elects not to pursue under 31 U.S.C. § 3730(c)(2)(a). Indeed, LogistiCare essentially argues that the Court should treat the government as having impliedly done that here.

That observation highlights at least one potential problem with LogistiCare's argument: because the statute provides an express mechanism to accomplish that very result, the Court is not generally predisposed to find that Congress also meant

22

to include in the statute an implied, yet unmarked, route to that same destination. The existence of an express path to achieve dismissal also highlights another shortcoming in LogistiCare's implied-dismissal view of partial intervention under the FCA. When the government follows that path for dismissal that the FCA expressly provides, the relators have certain procedural rights to object and be heard. 31 U.S.C. § 3730(c)(2). But the implied dismissal route that LogistiCare urges here would result in relators losing such rights—the case would continue as to the intervened claims, with the other claims tacitly dismissed. In light of the statute's express provisions as to how the government could achieve that end (and the related procedural rights conferred on relators), the Court sees no reason to read LogistiCare's implied-dismissal theory into the statute.

Nor do the other concerns that LogistiCare raises change that result. According to LogistiCare, allowing the Relators to continue means that the ship has "two masters." Not so. Each claim has a single master. The government is the master of the claims as to which it intervened, and Relators are the master as to the others.

The Court acknowledges that things could get a little messier if the government had intervened as to only *some of* the claims against a single defendant. Imagine the government considers some of the claims against that defendant to be strong (as to which it intervenes), and others against that same defendant to be weaker (as to which it does not). In that setting, LogistiCare's concern—that the relators' pursuit of the non-intervened claims may interfere with the government's pursuit of the intervened claims—seems like a genuine possibility.

23

But the Court offers two responses. First, perhaps "action" in the FCA is properly understood to refer to the entirety of the claims *as to a given defendant*. After all, the same section of the FCA that gives the government the right to intervene in "the action," repeatedly refers to "the defendant" in "the action." *See* 31 U.S.C. § 3730(b)(2) ("The complaint shall be filed in camera, shall remain under seal for at least 60 days, and shall not be served on *the defendant* until the court so orders."); § 3730(b)(3) ("*The defendant* shall not be required to respond to any complaint filed under this section …."); § 3730(c)(2)(B) ("The Government may settle the action with *the defendant* …."). Read in context, then, one could understand "the action" in that same statutory provision to refer to all of the claims asserted against the single defendant to which that section likewise refers. If that is correct, the government's decision not to pursue specific claims against a particular defendant as to which it is intervening would result in tacit dismissal of those claims against that defendant. So, *Brooks* would be right, but only as to the pursuit of non-intervened claims against a particular defendant as to which the government has intervened in part.

But, even if that is the appropriate reading of the FCA, an issue the Court need not, and thus does not, reach, that would offer no assistance to LogistiCare here. The government has not intervened as to some of the claims against LogistiCare. Rather, LogistiCare asserts implied dismissal based on the fact that the government intervened as against a *different* party (Mobile Care), but did not intervene against LogistiCare. The contextual argument above about what "the action" means in the

context of separate claims against a specific defendant offers LogistiCare no support for the result it seeks here.

Separately, as a practical matter, even in the multiple-claims-against-one-defendant setting described above, the statute affords the government the ability to protect itself against the concern that LogistiCare raises, i.e., that the relators' pursuit of the non-intervened claims may harm the government's pursuit of the intervened claims. First, as already noted, if the government has that concern in a given matter, the government certainly *could* assume all claims against the defendant as to whom it is intervening, and then settle those that it deems to be weak. Moreover, if the government determines after the fact that the relators' pursuit of the non-intervened claims is causing problems, the government may request that the court "limit[] the participation by [the relator] in the litigation." 31 U.S.C. § 3730(c)(2)(C). In short, the Court need not adopt a single-action reading of the FCA to protect against the concerns that LogistiCare raises.

It also bears mentioning that, while Mobile Care supports LogistiCare's argument on this implied-dismissal-under-the-FCA point (*see* MC Mot. to Dismiss Gov't Compl., Doc. 51, #400), Mobile Care does not suggest that this principle requires dismissal of Relator White's individual claims against Mobile Care. But why not? If there is in fact a single action for any qui tam suit under the FCA, as LogistiCare argues, then presumably the government either must take over that "action" or not. But "the action," understood that way, would include the individual claims, which the government of course cannot assume. Reading the FCA to require the government to

assume individual claims that the government cannot assume would be an odd result, but so far as the Court can tell, that result follows directly and unalterably from LogistiCare's reading of the term "the action."

In the end, the Court certainly agrees with Justice Alito—the FCA is no model of draftsmanship. Or as Justice Alito put it more recently writing on behalf of the Supreme Court in *Kellogg Brown & Root Services, Inc. v. United States, ex rel. Carter*, 575 U.S. 650, 664 (2015), "[t]he False Claim Act's qui tam provisions present many interpretive challenges," and it can be difficult "to make them operate together smoothly like a finely tuned machine." That being said, this Court finds that the statutory term "the action," when read in context, does not mean the entire lawsuit in the context of a multi-defendant FCA case. Accordingly, the Court holds that the government's decision to intervene as to the FCA claims against Mobile Care does not preclude Relators from pursuing their non-intervened FCA claims against a separate defendant, LogistiCare.

## 2. The Second Amended Complaint Sufficiently Alleges An FCA Claim Against LogistiCare.

As described above, aside from its partial-intervention argument, LogistiCare also seeks dismissal on the merits of the FCA claims. That argument does not work either.

It is important to recall that the Relators' only burden at this stage is to allege a plausible claim. Here, Relators allege that LogistiCare has caused claims to be submitted for ambulance transport despite knowing that such transport was not medically necessary. In particular, LogistiCare has continued to arrange for

companies like Mobile Care to provide such transportation services for particular patients, even after learning that such services are not medically necessary for those patients. Assuming these allegations are true, as the Court must, both LogistiCare (in connection with arranging the transport service) and companies like Mobile Care (in connection with providing the transport service) have knowingly made claims (or caused claims to be made) for, and indeed also received, funds to which they are not entitled under the terms of the government healthcare programs. That makes out a plausible FCA claim.

LogistiCare takes on that argument in two steps. First, it says that Relators have failed to sufficiently allege non-medically-necessary transport for anyone other than participants in MyCare Ohio, which is only one of the multiple government healthcare programs otherwise at issue in this action. Second, LogistiCare asserts that the payment structure for MyCare Ohio forecloses an FCA claim. In particular, the government pays a "capitated" rate—meaning a set amount per person who participates in the program. Thus, even if ambulance transport was over-provided to MyCare Ohio participants, no extra government funds were spent, and as a result, LogistiCare says, an FCA claim will not lie.

Because the Court's resolution of the latter capitated-payment point obviates the need to discuss the sufficiency of the allegations relating to other government healthcare programs, the Court starts with that issue. FCA liability turns on the presentation of a false claim. *See* 31 U.S.C. § 3729(a)(1). And here, "LogistiCare does not dispute that Relators have alleged 'claims' under [the FCA's] definition." (LC

27

Reply on Mot. to Dismiss, Doc. 71, #715). But, LogistiCare says, Relators must also allege that the defendant made a *material* false statement in connection with that claim, a proposition it finds in *United States ex rel. Sheldon v. Kettering Health Network*, 816 F.3d 399, 308 (6th Cir. 2016). And that, LogistiCare claims, is where the second amended complaint falls short.

This argument starts on firm legal footing. Here, Relators seek to pursue claims under both 31 U.S.C. §§ 3729(a)(1)(A) and (a)(1)(B). The statutory text of the latter expressly includes a materiality requirement. And, even though the former provision does not directly mention materiality, the Supreme Court has nonetheless confirmed that claims under this provision likewise require a showing of materiality in order to succeed. *See Universal Health Services v. United States ex rel. Escobar*, 136 S. Ct. 1989, 1996 (2016). Thus a plausible allegation of material falsity is required in order to survive dismissal under either section. Moreover, as already discussed above, there is no dispute as to what materiality means under the FCA. A statement is material if it tends to influence the payment or receipt of money. *See* 31 U.S.C. § 3729(b)(4).

Of course, there is little question that the statements regarding medical necessity here led to the payment of funds, so that would seem to meet the FCA's definition of materiality. But LogistiCare says not so fast, money means *government* money. And, in particular, the claim must lead to the payment of *more* government money, which under the MyCare Ohio payment structure cannot happen. And,

without an increased demand on the public fisc, LogistiCare argues, FCA liability cannot arise.

Two problems with that. First, the argument relies on LogistiCare's representations about how the MyCare Ohio payment structure actually works. Those details are not included in the second amended complaint, nor in the government's complaint-in-intervention. LogistiCare instead asks the Court to take "judicial notice" of these facts. But the source to which it points—which appears to be a report for the Centers for Medicare and Medicaid Services (*see* Doc. 60, #571–72)— is not necessarily the kind of source on which the Court would typically rely for purposes of "judicial notice." At the very least, the Court is not certain of how authoritative this report is, or whether it provides an adequate basis for such notice. And, given how central these facts are to LogistiCare's claim, that gives the Court pause.

The Court need not get to the bottom of that, though, as, even assuming that the federal government's payments to Aetna under the MyCare Ohio program are capitated, the Court does not agree that this would prevent LogistiCare's statements from being material. As pled in the second amended complaint, LogistiCare's practices led to LogistiCare and Mobile Care themselves receiving additional money to which they were not entitled from an entity that is funded at least in part by federal funds. Accordingly, the alleged conduct did "tend to influence" the payment of money. To be sure, the entity *paying* the money (i.e., apparently Aetna) will not receive any

additional federal funds as a result of these two defendants receiving the alleged payments. But that is beside the point.

LogistiCare argues otherwise, citing various cases involving capitated payments. But so far as the Court can tell, those cases involve a factual setting that differs in an important manner. In those cases, *the defendant itself* was the recipient of the capitated funding. That matters because, in such cases, the misrepresentation does not (indeed, cannot) result in *the misrepresenting entity* itself receiving more funds. So, for example, if a hospital receives $1000 per program participant per year to provide care, reporting (or even providing) unnecessary surgical procedures will not increase the amount that the hospital receives. In that context, legitimate questions could be raised as to whether that type of misreporting is "material" for FCA purposes. But here, there does not appear to be any dispute that Mobile Care and/or LogistiCare themselves are alleged to have received more money as a result of the allegedly false reports.

LogistiCare counters that the alleged overpayments nonetheless will not come from the public fisc, and that this is a line in the sand that the FCA cannot cross. But LogistiCare's assertion about the public fisc is not exactly true. A portion of the funding for MyCare Ohio (a capitated portion to be sure, but a portion nonetheless) comes from the "public fisc." Accordingly, if LogistiCare and Mobile Care are receiving payments from Aetna to which they are not entitled, some of the additional money those entities are receiving in fact could be said to come from the federal government.

To be sure, the federal government may not *pay* more, but the Defendants may *receive* more of the federal funds that the administrator (Aetna) was already paid.

Nor is there any question that Aetna is a recipient of federal funds who is "spen[ding] or us[ing] [the money] on the Government's behalf or to advance a Government program." *See* 31 U.S.C. § 3279(b)(2). And, as noted, there likewise can be no question that the federal government has "provided [a] portion of the money … requested." *Id*. Thus, Aetna is essentially "the government" for purposes of a claim under the FCA, meaning that anything that "tends to influence" the payment of claims under the Aetna-administered government program would be "material" for FCA purposes. On that front, as noted, there is no question that the Relators are alleging that the statements at issue "tended to influence" the payments that the Defendants received. That is enough for an FCA claim.

In sum, the Court finds that Relators have the right to pursue their FCA claims against LogistiCare, and that they have plausibly alleged such a claim for Rule 12(b)(6) purposes. Thus, the Court **DENIES** LogistiCare' Motion (and Amended Motion) to Dismiss the Second Amended Complaint (Docs. 59 and 60).

## B. Mobile Care's Motion To Dismiss The Government's Complaint-In-Intervention Fails.

Having addressed LogistiCare's Motion to Dismiss, the Court next turns to Mobile Care's Motion to Dismiss the government's complaint-in-intervention. As described above, that motion presses three arguments. First, it argues that the government has failed to allege an FCA claim, as it has not alleged that Mobile Care acted "knowingly" in connection with the alleged violation. Second, it argues that the

government's other claims turn on the validity of the FCA claims, so the failure to adequately allege an FCA claim renders these claims invalid as a matter of law, as well. Finally, it challenges venue.

The Court starts with Mobile Care's last argument first—venue. Mobile Care tacitly concedes that the Relators' second amended complaint alleges that LogistiCare engaged in conduct in the Southern District of Ohio, thereby establishing a basis for venue here. According to Mobile Care, though, LogistiCare is correct that the Relators' claims against LogistiCare fail as a matter of law, and thus "the government cannot use alleged conduct by LogistiCare in the Southern District of Ohio to establish venue." (MC Mot. to Dismiss Gov't Compl., Doc. 51, #401). But, as the Court has concluded that the Relators' second amended complaint states plausible FCA claims against LogistiCare, the predicate for Mobile Care's venue argument is not met. Thus, as LogistiCare will remain a party in this action, the Court **DENIES** Mobile Care's motion to transfer venue.

Next, the Court turns to Mobile Care's arguments on the merits. The Court rejects those arguments for two reasons. First, Mobile Care is essentially arguing that it has an innocent (or at least merely negligent) explanation for all of the facts that the government has alleged relating to Mobile Care's billings. That may well be the case. But a motion to dismiss is not the proper vehicle to assess which of two competing explanations of the facts are accurate. The allegations in the government's complaint plausibly show that Mobile Care knowingly submitted false claims for ambulance transport that was not medically necessary, and the allegations provide

sufficient details regarding the specific examples it offered to allow defendants "reasonably to pluck out" those claims "from all the other claims they submitted." *See United States ex rel. Owsley v. Fazzi Assocs., Inc.*, No. 19-4240, 2021 WL 4771702, at *3 (6th Cir. Oct. 13, 2021). If Mobile Care can show that it in fact did not make false claims, either as to the five specified examples, or others identified during discovery, Mobile Care will be entitled to prevail at trial, or perhaps even at summary judgment. But it is not entitled to dismissal of the complaint. Thus, the FCA claims can move forward.

Finally, the Court's determination on the FCA claims dooms Mobile Care's arguments on the government's other claims. Mobile Care's only real argument on those claims was that these claims relied on the existence of a viable FCA claim, which Mobile Care insisted was not present here. But, as the Court disagrees with Mobile Care on that front, Mobile Care's argument as to these other claims necessarily fails, as well.

Accordingly, the Court **DENIES** Mobile Care's motion to dismiss the two FCA claims, the unjust enrichment claim, and the payment by mistake claim.

## C. Mobile Care's Motion To Dismiss The Relators' Second Amended Complaint Fails.

That leaves Mobile Care's Motion to Dismiss the Second Amended Complaint (Doc. 58). In this motion, as described above, Mobile Care argues that the FCA retaliation claim and the two pendent state law wrongful termination claims fail as a matter of law. Separately, Mobile Care again argues that venue is improper here.

1.     **Mobile Care's Venue Challenge Fails For The Same Reason As It Did When Asserted Against The Government's Complaint.**

Once again, the Court starts with this last argument first. As was the case with Mobile Care's venue challenge to the government's complaint, the venue argument here hinges on Mobile Care's assertion that the claims against LogistiCare fail as a matter of law. The Court disagrees. Thus, Mobile Care's venue argument fails right out of the chute, and the Court thus **DENIES** the motion to transfer venue.

2.     **White Has Adequately Alleged An FCA Retaliation Claim.**

The Court next turns to the FCA retaliation claim. As Relators concede, to adequately plead such a claim, the plaintiff must allege three elements: (1) that the employee was engaged in protected activity, (2) that the employer knew that the employee was engaged in protected activity, and (3) that the employer discharged or otherwise discriminated against the employee as a result of the protected activity. (*See* Opp. to Mot. to Dismiss SAC, Doc. 65, #589).

a.     **White Alleges She Was Engaged In Protected Activities.**

Let's start with the "engaged in protected activity" element. Mobile Care's argument on this element stumbles a bit right at the outset because Mobile Care claims that the retaliation provision applies only to activities undertaken in furtherance of a potential False Claims Act suit, and that the allegations here fail to show that Relator White was acting in furtherance of such a suit before the time of her dismissal. (MC Mot. to Dismiss SAC, Doc. 58, #509). But, as Relators correctly point out, the 2009 amendments to the FCA broadened coverage under the retaliation provision. (Opp. to Mot. to Dismiss SAC, Doc. 65, #590). In its reply, Mobile Care does

34

not argue otherwise, meaning it appears all parties now agree that retaliation extends to activities beyond those in furtherance of a qui tam suit.

That being said, though, Relator White must still plausibly allege some "protected activity." On that front, the Relators' second amended complaint alleges that White "continued to insist that claims to Medicare for ambulance transport be billed to Government healthcare programs only if medical necessity both existed and was documented, and also that all other payment requirements were satisfied." (SAC, Doc. 53, #459). It likewise provides an example in which Relator White allegedly contacted CMS (the agency responsible for overseeing Medicare) to confirm that a particular transport as to a particular patient did not meet the requirements for medical necessity, and then informed her supervisor of that confirmation (but then Mobile Care nonetheless continued billing for transport for that patient anyway). (*Id.* at #473–74). At least at the pleading stage, those strike the Court as sufficient to plausibly allege that Relator White was engaged in efforts to prevent what she characterizes as false claims on government healthcare programs. Again, alleging is far different from proving, but at this stage only the former matters.

Mobile Care argues otherwise. It starts by noting that, even under the amended FCA, retaliation claims apply only to "efforts to stop" an FCA violation, not mere "expressions of interest of concern about compliance-related issues." (MC Reply in Supp. of Mot. to Dismiss SAC, Doc. 70, #687). And Mobile Care further observes that the alleged activity must "stem from a reasonable belief that fraud is being committed." (*Id.* (quoting *Fakorede v. Mis-S. Heart Ctr., P.C.*, 709 Fed. App'x 787, 789

35

(6th Cir. 2017))). But what of it? Relator White does not allege she merely had some kind of passing interest in Medicare compliance as an abstract matter, but rather that her interest in such matters was directed at attempting to stop Mobile Care's allegedly fraudulent billing practices. And, as chief of Mobile Care's billing-compliance efforts, her belief that fraud was occurring, based on the facts alleged, plausibly seems "reasonable," at least for pleading purposes.

None of this is to say that Mobile Care may not succeed on this defense. But, once again, Mobile Care appears to be pressing at the motion to dismiss stage arguments that, assuming the facts play out as Mobile Care suggests they will, would be better made at the summary judgment stage. Indeed, many, if not most, of the cases it cites on this issue are summary-judgment-stage cases.

For purposes of a motion to dismiss, Relator White has sufficiently pled the first element.

### b. White Alleges Mobile Care Was On Notice.

Next, Relator White must plausibly allege that Mobile Care was on notice of her protected activities. She clears that hurdle. To start, she specifically states that she "regularly informed [Mobile Care] that these claims were not legally compliant with requirements of the Government healthcare programs." (SAC, Doc. 53, #480). That reflects not only a protected activity (trying to prevent a fraudulent claim), but also that Mobile Care had knowledge of her engaging in that protected activity (as she was voicing her concerns directly to Mobile Care management). Indeed, one would imagine that a typical way in which a company receives notice of FCA-protected

activities is when a whistleblower first attempts to raise concerns within a company, only to later choose to file suit. That appears to be the case, for example, as to many of the cases on which Relators rely. (*See* Opp. to MC Mot. to Dismiss SAC, Doc. 65, #597).

Mobile Care again urges a different result. According to Mobile Care, because Relator White's job was to improve compliance with billing practices, her internal complaints about billing practices merely reflect her doing her job, and thus could not suffice to put Mobile Care on notice. That strikes the Court as a bit of a reach. To be sure, if an employee charged with overseeing compliance were merely to tell management, "we could do a better job on substantiating our claims," that may not suffice. In that circumstance, the employee is not necessarily even asserting that a given claim is fraudulent, let alone trying to dissuade the employer from asserting additional claims. But, whether or not that would suffice, Relator White alleges more here. Indeed, she provides an example of one patient as to whom she affirmatively obtained confirmation from the government agency in charge of Medicare that ambulance transport would not count as medically necessary, and that she told management of that fact, but that management nonetheless submitted "dozens" more claims for that patient. (SAC, Doc. 53, #473–74). At least for pleading purposes, that works.

### c. Relator White Has Adequately Alleged An Adverse Employment Action Caused By The Allegedly Protected Conduct.

The final element Relator White must plead to move forward with her claim is comprised of two sub-elements: (1) an adverse employment action, that was (2) caused by the employer's knowledge of her protected activities. *See Bourne v. Provider Servs. Holdings, LLC*, No. 1:12-CV-935, 2019 WL 2010596, at *3 (S.D. Ohio May 7, 2019).

Start with the former. Relator White alleges two adverse employment actions. She first says that Mobile Care demoted her in an attempt to prevent or minimize her interference in the allegedly fraudulent billing. (SAC, Doc. 53, #431). Separately, she alleges that Mobile Care fired her. (*Id*. at #432). Either of those would suffice (assuming she can show a causal link) to constitute an adverse employment action.

That leaves causation. Admittedly, White's allegations as to a causal link between the FCA-protected activities and the two adverse actions noted above require something of an inferential leap, but it is really more of a hop. According to Relator White, her insistence on compliance with government requirements was costing Mobile Care money, thus providing Mobile Care an economic incentive to remove her as an impediment to the allegedly unlawful billing. (*See id*. at #457–59). As separate support for the causal link, Relator White alleges that, when Mobile Care terminated her, it offered her $15,000 in what she claims amounted to a form of hush money to remain quiet about the alleged violations. (*See id*. at #459–60). Either or both of these allegations could easily prove false or mistaken, but separately or together they give rise to at least a plausible inference that Mobile Care's employment actions regarding

Relator White were undertaken in response to her alleged efforts to prevent fraudulent billing.

Especially given that both parties agree that "pleading causation is not difficult," (*see* MC Reply in Supp. of Mot. to Dismiss SAC, Doc. 70, #693 ("Mobile Care agrees with Relators' contention that '[p]leading causation is not difficult ….'")), Relator White clears that low bar.

In sum, given the pleading standards that apply in federal court, even post-*Iqbal* and *Twombly*, Relator White has validly stated an FCA retaliation claim. Thus, the Court **DENIES** the motion to dismiss that claim.

### 3. Mobile Care's Argument Against White's State-Law Claims Fails.

Finally, Mobile Care moves the Court to dismiss White's state-law wrongful termination claims. (MC Mot. to Dismiss SAC, Doc. 58, #514). That argument requires little by way of analysis, though, as Mobile Care's sole argument in support of that dismissal is its claim that White has failed to state a valid FCA retaliation claim, coupled with its assertion that White cannot resurrect a failed FCA claim in the guise of state-law wrongful termination claims. As the Court already has rejected Mobile Care's argument on the FCA retaliation claim, this argument necessarily fails, as well.

### D. ModivCare's Motion To Amend To Certify For Interlocutory Appeal.

Having addressed the merits of the various issues raised above, the Court now turns to the motion precipitating the amendments included in this Amended Opinion and Order. On November 10, 2021, 23 days after the Court's entry of the original

Order (Doc. 86) regarding LogistiCare's Motion to Dismiss Relators' Second Amended Complaint (Docs. 59 (original) and 60 (amended)), ModivCare Solutions, LLC (i.e., the entity formerly known as LogistiCare) moved this Court to amend the Order to certify it for interlocutory appeal under 28 U.S.C. § 1292(b). (Mot. to Amend to Certify for Interlocutory Appeal, Doc. 92). ModivCare argues that the Order satisfies the requirements of § 1292(b) specifically as to the question of whether "allegedly false claims submitted to healthcare programs that the United States funds through fixed, capitated payments can be material under the [False Claims Act]."[4] (*Id.* at #1031). Having considered the parties' briefing (Docs. 92, 98, 99, 100), the Court concludes that the Order satisfies the prerequisites of 28 U.S.C. § 1292(b) in that (1) the Order involves a controlling question of law, (2) as to which there is substantial ground for difference of opinion, and (3) an immediate appeal from the Order may materially advance the ultimate termination of the litigation.

For purposes of § 1292(b), "[a] legal issue is controlling if it could materially affect the outcome of the case." *W. Tenn. Chapter of Associated Builders & Contractors, Inc. v. City of Memphis*, 293 F.3d 345, 351 (6th Cir. 2002) (citing *In re Baker & Getty Fin. Servs., Inc.*, 954 F.2d 1169, 1172 n.8 (6th Cir. 1992)). Resolution of the question ModivCare identifies above would materially affect the outcome here. If the Sixth Circuit were to conclude that allegedly false claims submitted to

---

[4] The Court recognizes—as does ModivCare—that certification under § 1292(b) "applies to the *order* certified," *Yamaha Motor Corp., U.S.A. v. Calhoun*, 516 U.S. 199, 205 (1996), and that "even those issues not properly certified are subject to [the Sixth Circuit's] discretionary power of review if otherwise necessary to the disposition of the case," *Pinney Dock & Transp. Co. v. Penn. Cent. Corp.*, 838 F.2d 1445, 1455 (6th Cir. 1988). The Court adopts ModivCare's framing of the issue only insofar as it aids the Sixth Circuit's review.

intermediaries receiving only "capitated" funding from the United States cannot be "material" under the FCA, the Relators' Complaint would fail to the extent it alleges such a theory. In this way, immediate appeal also would, at least as to ModivCare, "materially advance the ultimate termination of the litigation"—litigation which has already lasted over six years. And, while the Court concludes, for the reasons discussed above, that it correctly analyzed the issue that ModivCare raises in its motion to certify, the Court concedes that "reasonable jurists might disagree" on the appropriate resolution of that issue. *In re Trump*, 874 F.3d 948, 952 (6th Cir. 2017) ("A substantial ground for difference of opinion exists where reasonable jurists might disagree on an issue's resolution …." (quoting *Reese v. BP Exploration, Inc.*, 643 F.3d 681, 688 (9th Cir. 2011))).

## CONCLUSION

For the reasons stated above, the Court **DENIES** LogistiCare's Motion to Dismiss Relators' First Amended Complaint (Doc. 50) and Mobile Care's Motion to Dismiss Relators' First Amended Complaint (Doc. 52), as moot. The Court further **DENIES**: (1) Mobile Care's Motion to Dismiss the Government's Complaint in Intervention (Doc. 51); (2) Mobile Care's Motion to Dismiss Relators' Second Amended Complaint (Doc. 58); and (3) LogistiCare's Motion to Dismiss Relators' Second Amended Complaint (Docs. 59 (original) and 60 (amended)). To the extent that Mobile Care separately moves for a transfer of venue in the motions cited above, the Court **DENIES** that request, as well.

However, the Court **GRANTS** ModivCare's (formerly known as LogistiCare) Motion to Amend to Certify for Interlocutory Appeal (Doc. 92). As such, the Court hereby **CERTIFIES** that this Amended Opinion and Order "involves a controlling question of law as to which there is substantial ground for difference of opinion" and "an immediate appeal from the order may materially advance the ultimate termination of the litigation." *See* 28 U.S.C. § 1292(b). That said, the Court expressly notes that it declines to stay the current proceedings in connection with that certification, although it recognizes that "the Court of Appeals or a judge thereof" may order such a stay, should that court deem it appropriate. *See id.*

  **SO ORDERED.**

December 21, 2021
**DATE**                         **DOUGLAS R. COLE**
                                 **UNITED STATES DISTRICT JUDGE**